[No. H030005. Sixth Dist. Sept. 28, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
LEONARD JOHN ROSS II, Defendant and Appellant.

## COUNSEL

David McNeil Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Mary Jo Graves, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Stan Helfman and Margo J. Yu, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**RUSHING, P. J.**—Maria Antonia Speiser and defendant Leonard John Ross II engaged in a hostile verbal exchange, at the culmination of which she slapped him. Defendant responded with a blow that fractured her cheekbone. We are called upon to consider whether the participants were engaged in "mutual combat" for purposes of the law of self-defense. Defendant was convicted of aggravated assault and battery after the trial court instructed the jury, over defense objection, that one charged with assault cannot successfully plead self-defense if he was engaged in "mutual combat" with the alleged victim. Further, the court refused the jury's request during deliberations for a legal definition of "mutual combat," telling jurors instead to rely on the ordinary meaning of those words. This left the jury free to suppose that any exchange of blows disqualifies both participants from claiming a right of self-defense. In fact the doctrine applies only to a violent confrontation conducted pursuant to prearrangement, mutual consent, or an express or implied agreement to fight. Since the evidence here was insufficient to establish any such arrangement or agreement, and there was a substantial basis for the jury to find that defendant may have acted in self-defense when he struck the blow on which the verdict was based, we find it reasonably probable that a properly instructed jury would have returned a verdict more favorable to defendant. We therefore reverse the judgment.

### BACKGROUND

On a June morning in 2004, defendant visited his friend Henry Mestaz at the latter's home in a Morgan Hill trailer park. Also living at the trailer, and present that day, were Henry's then girlfriend Amy Jonathans, whom he later married; Amy's four children, aged two to nine; and Amy's mother, Wendy Sue Burns. Toni Speiser, the alleged victim in this case, visited off and on during the day, as did her then boyfriend Donny, and his two children.[1]

---

[1] For the sake of narrative clarity, we will refer to participants other than defendant by their first names.

Around 3:30 that afternoon, defendant and Henry were sitting at a picnic table under an awning outside the trailer, in a porch or patio area. According to defendant, they had been playing dominos. Toni was sitting on a futon-couch near the table and against the side of the trailer. Amy was standing near a rose bush. As many as three children were present.

Amy was upset because Henry had invited defendant to move into the trailer. Amy felt there was not enough room. Also, she had three daughters in the house and did not like men staying there. Amy let defendant know that she wanted him to leave. According to defendant, however, Henry urged him to remain, and he did so.

Amy then began declaiming upon the undesirability of having strange men around young children. She asked Toni how she felt about it, and Toni concurred, saying that "you never know what's going to happen" when there are lots of men around a house with children. According to defendant, Toni's remarks culminated in the imprecation, " 'Fuck you.' You know. 'Fuck those guys,' you know, 'those guys that come around.' "

Defendant testified that he now told Toni, " 'Hey, you need to watch your language.' " " 'There's kids around.' " He professed not to approve of cursing around children, and some support for this assertion appears in Amy's testimony that defendant "very seldom ever cussed." Amy agreed that defendant told Toni to stop cussing and have some respect. She said that there probably was swearing going on, though she did not specifically recall it because she considered it normal.

Toni did not recall saying anything foul, but acknowledged that she might have done so. She testified that before this became an issue, defendant had interjected something into the conversation between the two women, where-upon Amy had "told him to stay out of it, because she wasn't talking to him; she was talking to me." Amy and Toni had then both told defendant to " 'Mind your own business' or 'Butt out of the conversation' or 'We're not talking to you.' " According to Toni, this seemed to anger defendant, who only then started telling her she was cussing and using foul language in front of the children and should shut up.

A heated exchange ensued. According to Toni, defendant "started saying that I was using a lot of profanity and that—to stand up and go behind the trailer, that he was going to kick my ass." She told him to wait until her boyfriend Donny got back. Defendant testified that when he objected to Toni's language, she responded, " 'You don't tell me what to do. This—

you're not my old man.' Like, 'I'm going to tell Donny,' you know. 'You don't be telling me nothing.' " Defendant said that he responded in a playful, nonthreatening manner. Toni then said, " 'I'll get somebody,' you know, 'to kick your ass.' " Defendant said, " 'What? What? You want to—you—what? You threatening me? You want to kick my ass? We can go around the back. Is that what you want to do?' " This was uttered, he testified, not in a literal sense but in a "joking manner" as a way of "clown[ing]" with her.

According to Amy, the argument went back and forth for some minutes.[2] Toni was saying that she would "have somebody" take care of defendant or would get someone to "kick [his] ass." Defendant responded to one such remark with the query, "[W]hy don't you do it?" He also said something like, "Let's go out back and take care of business." Amy acknowledged that this might have been said in a "humorous" vein. Toni, however, was not joking. Amy described her as "challenging" defendant in a manner Amy found shocking. The only specific challenge Amy attributed to Toni was that she would have somebody else "take care of" defendant.

At some point defendant stood up. He testified that he did so because Henry was talking to him about getting some beer, and he wanted to check his pockets for his wallet. Amy felt that defendant might have been getting up to light a cigarette; in any event "it wasn't to go towards [Toni] or anything like that . . . ." According to defendant and Amy, defendant now said to Toni, " 'You sound like an old whore.' "[3] According to Toni, defendant called her "a fucking whore." Whatever his exact words, they angered Toni. Upon hearing them, she rose and walked toward defendant with her right hand open, intending to hit him. She believed she had her glasses and cigarettes in her left hand. She did not remember anything after approaching defendant, and could not say whether she hit him hard or soft, with an open hand or a closed one. It was undisputed, however, that she struck him. Defendant described the blow at trial as a "punch," though Officer Ray testified that defendant told him Toni had "slapped" him twice. Amy testified somewhat tentatively that she thought Toni's hand was open. The blow did not seem to her to have been delivered with "a lot of force," but neither was it "light." It was audible.

---

[2] Amy testified that she had a bad cold at the time of trial, had taken an over-the-counter medication for it, and that her thought processes were clouded. She remembered what was said, but not the order in which it was said.

[3] Although defendant's testimony is somewhat muddled on this point, he could be understood to say that he spoke sotto voce, out of sensitivity to the adolescent child Donald, who he said was sitting next to Toni. Again Amy provided arguable corroboration, testifying that defendant spoke, as he always did, without raising his voice. She said he had maintained a low conversational tone throughout the exchange.

It appeared to Amy that defendant was not expecting the blow. He "took a couple steps back," she thought more from "shock" than from the force of it. Defendant testified that, indeed, the blow took him by surprise. When it landed, he said, his attention was diverted to the child Donald, whom Toni had pushed out of the way. As Toni approached, defendant testified, he "wasn't thinking about we were going to fight or anything. I just thought we were talking, to be honest. I mean, I didn't think she was that kind of woman to start, you know . . . ." He testified that in response to the blow he may have closed his eyes. He lifted his arm and felt a second blow. "I don't know if that woke me up or what. I don't even know if I was really struck again. I just know my eyes opened up and I seen somebody—like I was boxing somebody. I came over with a overhand right, and I hit the person right on the cheek." In doing so, he testified, he believed he was going to be hit again. He believed his first punch either was or may have been part of a right-left combination, so that he "came over with a left," and perhaps a third blow. Toni fell back on the futon. By then Henry had stood from the table. In response to Amy's excited exclamations, he stepped between defendant and Toni, pushing them apart. At Henry's urging, defendant left.

Amy recalled defendant's response as more protracted. She testified that after Toni slapped defendant, he "just started hitting her." His first blow was a punch so hard it "shocked" Amy. He seemed to strike with all his might. Amy thought he hit Toni 10 to 15 times. He might have used both hands. Most of the blows were struck after Toni was "laid down on the futon . . . ." Amy thought the later punches were thrown with force similar to the first. She could not be sure how many of them connected; she could only be sure of the one that caused Toni to fall back on the futon. Toni was screaming, and probably putting her hands up to block.

Throughout this time Amy was yelling at Henry to get defendant "out of here," "get him to stop," and "[g]et him off of her." "There was a lot of yelling going on. Like, kids were screaming and everything." Amy hit defendant over the head with a cordless telephone, but this appeared not to faze him. Eventually Henry grabbed defendant by the waist and pulled him off Toni. As he did so defendant was pulling Toni's hair. Defendant left, perhaps after standing around talking for a minute. Toni, still screaming, ran into the kitchen to get something to put on her face.

Toni testified that after she approached defendant to hit him, the next thing she remembered was "lying down on the futon and . . . being hit." It seemed like he hit her many times. It hurt. She could feel and hear bones breaking. After what seemed like a long time, she got up and ran into the house. She applied a bag of frozen vegetables to her face. She was taken by ambulance to the hospital, where she underwent surgery. At the time of her testimony,

she could feel the metal they put in her face. Sometimes it stuck out, and sometimes it hurt. She sometimes had blurry vision in her left eye. She also suffered depression.

Officer David Ray testified that he arrested defendant near the trailer park for battery. After declining to assert his *Miranda*[4] rights, defendant told the officer that Toni was cursing around the children and cursing and yelling at him. He told her that only a whore would use that sort of language, whereupon she slapped him twice. He then "pushed" her "with his fist." Asked to explain the term "push," he told the officer that he was "trained as a boxer and that a boxer does not state that they hit anyone. They use the word 'push' instead."[5] He said he struck her "several" times. He said he was just defending himself, and expressed the belief "that if somebody starts a fight, in self-defense you're permitted to finish that fight. And since Ms. Speiser had started this fight by slapping him, anything he did thereafter was self-defense." He said that "she started it, and he finished it." He said that she's a big woman and he dealt with her as though she wanted to fight.[6] When arrested defendant had a small red mark under his left eye. He said he believed it was from Toni slapping him. He declined medical attention. Officer Ray testified without objection that he had noticed that defendant's pupils did not contract, and attributed this to ingestion of a stimulant, though a blood test was negative. The failure to contract could also be explained by a concussion. Normally, however, a concussion will only affect one eye, and defendant's eyes showed "approximately the same dilation."

Officer Ray also interviewed Toni, who told him that she had gotten up and slapped defendant, in response to which he had punched her in the face, causing her to fall on the couch. She said "that she blacked out several times during the ordeal." The only injuries the officer observed on her were to the left side of her face.

Called by the defense as an expert, plastic surgeon David Kaufman testified that he had operated on Toni for a fractured cheekbone. The bone was fractured at four points where it joined other parts of the face. In Dr. Kaufman's opinion this injury was caused by a single blow. Apart from associated swelling, he observed no other injuries. Toni complained of none, and none were reflected in her records. A radiologist had noted a possible jaw

---

[4] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

[5] Defendant testified that he had some boxing training from the ages of seven to 13, and then 17 to 19.

[6] Toni testified that she was five feet seven inches tall and weighed about 195 pounds at the time of the incident. Defendant testified that he was five feet six inches and weighed 212 pounds at trial, but he insisted that he had only weighed 130 to 140 pounds at the time of the incident. Officer Ray estimated defendant's then weight at 180 pounds, and testified that defendant also gave that figure when interviewed.

fracture, but Dr. Kaufman saw no appreciable evidence of that. If someone were hit on the head 10 to 15 times, he would expect to observe additional injuries, e.g., a fractured nose or jaw, teeth knocked out, or cut lips. If more than one blow had in fact been struck, he could not say with certainty which one inflicted the injury. If it were known that defendant delivered a "right punch and a left punch, one right after the other," he would bet that "his right hook did it," because that is the common pattern when a right-handed person fractures another's left cheekbone. It is very "unlikely" that even a person with boxing training would break someone's left cheekbone with his left hand. It was also "pretty unlikely" that an initial blow might have weakened the bone such that a later one "actually . . . [got] it to collapse." A blow sufficient to inflict the injury he observed would "[v]ery typically" knock the recipient "down and out," meaning it would render them unconscious.

As relevant here, defendant was charged with battery causing serious bodily injury (Pen. Code, §§ 242, 243, subd. (d)), and assault by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(1)). As to each count it was alleged that he personally inflicted great bodily injury for purposes of Penal Code sections 667 and 1192.7. It was further alleged that he had sustained four prior convictions of serious or violent felonies for purposes of the "Three Strikes" law (Pen. Code, §§ 1170.12, 667, subds. (b)–(i)), one of which also qualified as a prison prior under Penal Code section 667.5, subdivision (c), and one of which also qualified as a serious felony under Penal Code section 667, subdivision (a).

In the first trial of this matter, the jury was unable to reach a verdict on these charges.[7] At the conclusion of the second trial the court instructed the jury, as it had not in the first, on the doctrine of "mutual combat." The jury found defendant guilty of aggravated assault and aggravated battery, and sustained the great bodily injury allegation. The trial court denied a motion to strike prior convictions, and sentenced defendant to 25 years to life plus 11 years. Defendant filed this timely appeal.

DISCUSSION

## A. *Introduction*

Defendant's sole contention is that the trial court erred by instructing the jury on the doctrine of "mutual combat" as it affects a plea of self-defense. At

---

[7] Defendant was also charged with two misdemeanors: using or being under the influence of a controlled substance (Health & Saf. Code, § 11550, subd. (a)), and possession of a syringe (Bus. & Prof. Code, § 4140). Prior to the first trial, the trial court dismissed the under-the-influence charge under Penal Code section 995. At that trial the jury found defendant guilty of the possession-of-syringe charge.

the first trial, the court refused to instruct on this subject. The filed copy of the instruction as proposed at that time bears the handwritten notation, "refused[,] no evid[ence]." At the second trial the court seemed to initially reach the same conclusion, stating, "There's no mutual combat." The prosecutor protested, arguing that the instruction was necessary to meet a defense theory that defendant was not guilty of aggravated assault and battery but only of lesser included offenses. The court reversed itself and agreed to give the instruction "because of the lessers."[8]

Consistent with this ruling, the court instructed the jury that one engaged in "mutual combat" cannot invoke the right of self-defense unless he has first taken specific steps to terminate, or withdraw from, the conflict.[9] After retiring to deliberate, the jurors sent a note asking the court to "clarify jury instruction 38 'mutual combat.' " Questioned by the court, jurors confirmed that they sought "[a] legal definition of what it constitutes." The court recessed for the day, and according to a notation in the minutes, the clerk telephoned counsel and read them the jury's note, in response to which "[e]ach indicate[d] that they ha[d] nothing to add to jury instruction # 38."[10] When proceedings resumed the next day, the court told the jury, "[R]egarding

---

[8] The pertinent exchange appears in the transcript as follows:

"THE COURT: . . . And [CALJIC No.] 5.56.1 [sic; 5.56].

"MR. KIRCHICK [defense counsel]: I did not offer it.

"THE COURT: There's no mutual combat.

"MR. KIRCHICK: I'm not offering this, and I object to it.

"MR. BOYD [prosecuting counsel]: Well, your Honor, the problem I have with Counsel's objection is, as I understand their argument, they're actually going to suggest that the defendant had the right to self-defense in the one, two punch that he described to the jury. And they're, in fact, asking for lessers thereafter in case the jury finds that the thereafter is not self-defense. And this instruction directly relates to that.

"THE COURT: All right. I'll give it.

"MR. BOYD: If Counsel doesn't get the lesser, then I'm not asking for this instruction.

"THE COURT: I'll give it because of the lessers."

[9] The instruction appears in the reporter's transcript as follows: "The right of self-defense is only available to a person who engages in mutual combat if he has done all of the following:

"1. He has actually tried, in good faith, to refuse to continue fighting;

"2. He has clearly informed his opponent, by either words or conduct, that he or she wants to stop fighting; and

"3. He has clearly informed his or her opponent, by either words or conduct, that he or she has stopped fighting; and

"4. He has given his opponent the opportunity to stop fighting.

"After he has done all these four things, his right—he has a right to self-defense if his opponent continues to fight." (See CALJIC No. 5.56; Judicial Council of Cal. Crim. Jury Instns. (2006) CALCRIM No. 3471.)

[10] When the court went on the record to acknowledge the jury's note, and to respond to it the following day, the court recited, "[C]ounsel and defendant are not present, by stipulation." The record reflects stipulations that recesses and adjournments could occur in their absence, and that readbacks could be conducted in the deliberation room. No issue is made on appeal of counsel's and defendant's absence at the time of the relevant proceedings.

your request yesterday for a legal definition of mutual combat, there is no legal definition. You're going to have to use your common, everyday meaning of those words or that phrase. Okay. I know that instruction that you were dealing with, No. 38, is about mutual combat, but there is no legal definition of it."

The case presents four questions: (1) What is the meaning of "mutual combat" as that phrase is used in this state's law of self-defense? (2) Was there sufficient evidence of "mutual combat," so understood, to justify an instruction to the jury on that subject? (3) Did the court adequately instruct the jury on the subject? (4) If the trial court erred with respect to question 2 or question 3, does the error warrant reversal?

## B. *Mutual Combat*

■ Like many legal phrases, "mutual combat" has a dangerously vivid quality. The danger lies in the power of vivid language to mask ambiguity and even inaccuracy.[11] Here the jury was told that participation in "mutual combat" conditionally bars the participants from pleading self-defense if either is prosecuted for assaulting the other.[12] The "combat" element of this rule is clear enough, at least for present purposes. It suggests two (or more) persons fighting, whether by fencing with swords, having a go at fisticuffs, slashing at one another with switchblades, or facing off with six-guns on the dusty streets of fabled Dodge City. The trouble arises from "mutual." When,

---

[11] The actual reach of any legal term may depend upon, and vary with, the context in which it is used and the underlying policy rationale or objective it is intended to express or effectuate. The phrase "mutual combat" appears in at least three different legal settings, and its meaning may be expected to vary depending on its role in each. In the law of torts, a plaintiff's involvement in mutual combat with the defendant may or may not, depending on the jurisdiction, furnish a defense to a cause of action for battery. (See Rest.2d Torts, § 892C, com. b & illus. 1–3, pp. 376–377; Prosser & Keeton, Torts (5th ed. 1984) § 18, p. 118; *Hudson v. Craft* (1949) 33 Cal.2d 654, 656 [204 P.2d 1].) In the law of criminal homicide, the victim's participation in mutual combat with the defendant may mitigate the latter's offense from murder to manslaughter. (E.g., *People v. Whitfield* (1968) 259 Cal.App.2d 605, 609 [66 Cal.Rptr. 438]; *People v. Bush* (1884) 65 Cal. 129, 132 [3 P. 590].) And as relevant here, involvement in mutual combat may preclude reliance on self-defense to defeat a charge of assault, or similar offense, unless the defendant took specific steps to desist from the combat. (Pen. Code, § 197 (section 197).) We note that even in the context of tort law, where the phrase might well be expected to take on different connotations than in the context of criminal assault and battery, it is said that "[t]o constitute mutual combat . . . a mutual intent and willingness to fight must exist." (6A C.J.S. (2004) Assault, § 23, p. 226.)

[12] The rule is codified with respect to homicide cases at section 197: "Homicide is also justifiable when committed by any person . . . [¶] . . . [¶] (3) . . . in the lawful defense of such person . . . when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished; but such person . . . , if he was the assailant or engaged in mutual combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed . . . ."

for these purposes, is combat "mutual"? What distinguishes "mutual" combat from combat in which one of the participants retains an unconditional right of self-defense?

The trial court told the jury that the law furnishes no special answer to these questions, and that any answer must be found in the "common, everyday meaning of those words or that phrase." Respondent presses this view before us, asserting that "the phrase 'mutual combat' has the common everyday meaning that the combatants want to fight . . . ." But this is not true, and even if it were true it would only establish that the lay meaning of "mutual combat" is too broad to convey the correct legal principle.

The dictionary meaning of "mutual" does not necessarily convey any particular intention on the part of persons whose conduct it is used to describe. It is defined as "directed by each toward the other," "shared in common," or "joint" (Merriam-Webster's Collegiate Dict. (10th ed. 1999) p. 768), "[h]aving the same relationship to each other," "[d]irected and received in equal amount," or "reciprocal" (American Heritage College Dict. (3d ed. 1997) p. 901). Thus any combat may be correctly described as "mutual" so long as it is seen to possess a quality of reciprocity or exchange. In ordinary speech, then, "mutual combat" might properly describe any violent struggle between two or more people, however it came into being. If A walks up to B and punches him without warning, and a fight ensues, the fight may be characterized as "mutual combat" in the ordinary sense of those words. But as this example demonstrates, the phrase so understood may readily describe situations in which the law plainly grants one of the combatants a right of self-defense. In the case above, B would be entitled under the law of this state to punch A immediately, without further ado, provided he acted out of an actual and reasonable belief that such action was necessary to avert imminent harm (*People v. Stitely* (2005) 35 Cal.4th 514, 551–552 [26 Cal.Rptr.3d 1, 108 P.3d 182]), and he used no more than reasonable force (1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Defenses, § 72, p. 407). That right cannot be forfeited or suspended by its very exercise. Yet that is the effect of relying on the everyday meaning of "mutual combat." B's entitlement to strike back in self-defense would then be conditioned, absurdly, on his first refusing to fight, communicating his peaceable intentions to his assailant, and giving his assailant an opportunity to desist.[13] By then, of course, his assailant might have beaten him senseless.

---

[13] California belongs to the majority of jurisdictions with a "[n]o [r]etreat [r]ule," under which the victim of an assault is under no obligation to " 'retreat to the wall' " before exercising the right of self-defense, but is entitled to " 'stand his ground.' " (1 Witkin & Epstein, Cal. Criminal Law, *supra*, Defenses, § 74, p. 408.) The phrase "mutual combat" may well carry a different sense in a jurisdiction where one is not entitled to stand one's ground if there is an opportunity to retreat.

As used in the present context, the phrase "mutual combat" is not only ambiguous but a misnomer. The mutuality triggering the doctrine inheres not in the combat but in the *preexisting intent to engage in it*. Old but intact case law confirms that as used in this state's law of self-defense, "mutual combat" means not merely a reciprocal exchange of blows but one *pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities*. The lead case appears to be *People v. Fowler* (1918) 178 Cal. 657, 671 [174 P. 892] (*Fowler*), disapproved on another point in *People v. Thomas* (1945) 25 Cal.2d 880, 901 [156 P.2d 7], where the court wrote, "It has long been established that one who *voluntarily engages* in mutual combat with another must have endeavored to withdraw therefrom before he can be justified in killing his adversary to save his own life. . . . Both before and since [the 1872 enactment of Penal Code section 197] the phrase 'mutual combat' has been in general use to designate the branch of the law of self-defense relating to homicides committed in the course of *a duel or other fight begun or continued by mutual consent or agreement, express or implied*. [Citations.]" (Italics added.) In other words, it is not merely the *combat*, but the *preexisting intention to engage in it*, that must be mutual.[14]

This principle is supported by every decision we have found in which a pertinent point is considered. In *People v. Hecker* (1895) 109 Cal. 451 [42 P. 307], the court wrote that self-defense "is not available as a plea to one who[,] *by prearranged duel, or by consent*, has entered into a deadly mutual combat in which he slays his adversary." (*Id.* at p. 462, italics added.) In *People v. Hatchett* (1944) 63 Cal.App.2d 144 [146 P.2d 469], the evidence suggested that the defendant shot the victim, a former lover, either in cold blood or under threat of imminent assault. (*Id.* at pp. 148–149.) The Court of Appeal held that there was no evidence to support an instruction on mutual combat, i.e., "combat *entered into* voluntarily," as distinct from combat "under circumstances which did not compel her to retreat." (*Id.* at p. 163, italics added.)[15]

In *People v. Rogers* (1958) 164 Cal.App.2d 555 [331 P.2d 163], a dispute between two drivers escalated into a "general melee" when the first driver,

---

[14] Respondent glosses over this requirement by asserting that the doctrine requires only that both parties "want to fight." Missing is the critical requirement that this common intention or desire must precede the first assaultive conduct, or at least the first conduct sufficient to trigger a right of self-defense in its target. If A triggers such a right in B by striking him, B does not forfeit that right merely because the blow makes him "want to fight." Hot blood may cause him to exercise the right unreasonably, and to that extent he will forfeit it. But his "want[ing] to fight" does not make it a case of mutual combat.

[15] The trial court there had also erred by instructing in the original language of section 197, which referred to "mortal" rather than "mutual" combat. (*People v. Hatchett, supra*, 63 Cal.App.2d at p. 163.) This language was described in *Fowler* as "probably a misprint." (*Fowler, supra*, 178 Cal. at p. 671.) In 1931 the Legislature amended the statute to refer to "mutual combat." (Stats. 1931, ch. 697, § 1, p. 1439.)

accompanied by a group of friends, attacked the second driver, and his friends, at the second driver's home. (*Id.* at p. 557.) The defendant, a member of the defending group, was charged with fatally stabbing one of the attackers. (*Ibid.*) The jury was instructed on the duty to desist as a precondition to self-defense when " 'two persons . . . by prearrangement, or otherwise by agreement, enter into and carry on a duel or deadly mutual combat.' " (*Id.* at p. 558.) The reviewing court held this instruction "wholly outside the evidence" because there was "no showing, directly or by inference, that defendant had any *prearrangement to fight* anybody, and certainly none connecting him in any such way with decedent." (*Ibid.*, italics added.) The case did not present a situation where "two gangs agree to meet for combat.[16] Rather, as the record now stands, [the defending driver] merely refused to flee his home in the face of [the invading driver's] threat to return there. Even if [the former's] words and deeds are imputable to defendant, they do not show an agreement or arrangement for mutual combat." (*Ibid.*)

A more recent case, *People v. Quach* (2004) 116 Cal.App.4th 294 [10 Cal.Rptr.3d 196], might be cited to support a broader definition of "mutual combat," but does not actually address the issue before us. The relevant evidence there was complicated by numerous varying versions of events, and the pertinent facts are not readily apparent, except that two groups of rival gang members left a bar and eventually engaged in a "shootout" in which the defendant injured the victim. (*Id.* at p. 297.) The reviewing court opined in passing that "[t]he jury could quite reasonably have concluded this was a mutual combat situation." (*Id.* at pp. 300–301.) But there appears to have been no dispute on that point, and there is no indication that the court viewed it as controversial. Certainly it acknowledged none of the cases we have cited. Instead the court held that on the facts there, it was reversible error to instruct on mutual combat without further instructing on the right of a mutual combatant to reclaim the privilege of self-defense when subjected to an attack " '*so sudden and perilous that he cannot withdraw*. . . .' " (*Id.* at p. 302, quoting *People v. Sawyer* (1967) 256 Cal.App.2d 66, 75, fn. 2 [63 Cal.Rptr. 749].)

█ We are satisfied that "mutual combat" consists of fighting by mutual intention or consent, as most clearly reflected in an express or implied

---

[16] Determining what constitutes mutual combat in the setting of a gang battle or war may present unique difficulties. (Cf. *People v. Sanchez* (2001) 26 Cal.4th 834, 847–848 [111 Cal.Rptr.2d 129, 29 P.3d 209] [liability for bystander deaths where gangs engaged in "mutual combat"]; *id.* at p. 848, quoting *Alston v. State* (1995) 339 Md. 306, 320 [662 A.2d 247, 254] [" 'there was sufficient evidence to support a jury finding that rival groups tacitly agreed, pursuant to an "unwritten code of macho honor," that there would be mutual combat and that each group aided, abetted and encouraged its adversary to engage in urban warfare' "].) These difficulties are not present here, where the paradigm is MacBeth versus MacDuff, not the Capulets versus the Montagues.

*agreement* to fight. The agreement need not have all the characteristics of a legally binding contract; indeed, it necessarily lacks at least one such characteristic: a lawful object. But there must be evidence from which the jury could reasonably find that *both combatants actually consented or intended to fight before the claimed occasion for self-defense arose.*

## C. *Error*

### 1. *Response to Jury Question*

By statute, trial courts are required, on request of a deliberating jury, to instruct "on any point of law arising in the case." (Pen. Code, § 1138.) The meaning of "mutual combat" was clearly a "point of law arising in the case," and one on which the jury explicitly sought guidance. The trial court erred by leaving the jury to suppose that "mutual combat" involved no particular legal requirement, but should be understood and applied in an ordinary, lay sense.

Respondent contends that defendant forfeited the claim of error because he did not request any elaboration on the mutual consent instruction before it was given. This failure, however, would at most pose an obstacle to an appellate challenge based on the inadequacy of the *original instruction.* (See *People v. Solis* (2001) 90 Cal.App.4th 1002, 1014–1015 [109 Cal.Rptr.2d 464] [where defense did not request further definition of " 'sustained' " as used in criminal threat statute, "the court had no sua sponte obligation to define that word because it is a commonly understood word and was not being used in a technical sense peculiar to the law"].) We are more concerned with the court's failure to elaborate on the instruction after the jury expressly asked the court for a "legal definition" of mutual combat. Penal Code section 1138 cast upon the court a " 'mandatory duty' " to "clear up" the jury's misunderstanding. (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1212 [275 Cal.Rptr. 729, 800 P.2d 1159].) The court need not always elaborate on the instructions already given if they were "full and complete." (*Id.* at p. 1213; see *People v. Smithey* (1999) 20 Cal.4th 936, 1009 [86 Cal.Rptr.2d 243, 978 P.2d 1171] ["the court has an obligation to rectify any confusion expressed by the jury regarding instructions, but has discretion to determine what additional explanations are sufficient to satisfy the jury's request for information"].) "However, '[a] definition of a commonly used term may nevertheless be required if the jury exhibits confusion over the term's meaning.' " (*People v. Solis, supra,* 90 Cal.App.4th at p. 1015, quoting 5 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Criminal Trial, § 633, p. 906.) That further guidance may not come easily to hand, or is not supplied by counsel, does not excuse the court from its statutory duty. Reluctance to "strike out on its own" does not permit the court to "figuratively throw up its hands and tell the jury it cannot help."

(*People v. Beardslee* (1991) 53 Cal.3d 68, 97 [279 Cal.Rptr. 276, 806 P.2d 1311]; see *People v. Moore* (1996) 44 Cal.App.4th 1323, 1331 [52 Cal.Rptr.2d 256].)

Respondent contends that defense counsel, by failing to object, waived any challenge to the court's failure to define "mutual combat." According to the minutes, the clerk telephoned both counsel and "read[] each of them the request as stated in [jury] Communication #4," whereupon each said that he had "nothing to add to jury instruction #38," i.e., the mutual combat instruction already given. But the cited communication was nebulous: "Judge, clarify jury instruction 38, mutual combat." Upon questioning by the court, jurors further said that they "needed a clear definition of mutual combat." Someone, presumably the court, added a notation to the request which we take to read, "legal def of MC—what it constitutes." However there is no clear indication that this clarification was conveyed to counsel. Certainly there is no evidence that counsel was ever apprised of the court's intention to tell the jury, mistakenly, that there *is* no legal definition of "mutual combat."

■ No well-reasoned case predicates a forfeiture of a similar objection upon similar conduct. A defendant may forfeit an objection to the court's response to a jury inquiry through counsel's consent, or invitation or tacit approval of, that response. (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1193 [36 Cal.Rptr.2d 235, 885 P.2d 1] ["Inasmuch as defendant both suggested and consented to the responses given by the court, the claim of error has been waived."]; *People v. Hughes* (2002) 27 Cal.4th 287, 402 [116 Cal.Rptr.2d 401, 39 P.3d 432] [claim of error was "waived by defense counsel's agreement with the trial court that informing the jury of the consequences of a deadlock would have been improper"]; *People v. Bohana* (2000) 84 Cal.App.4th 360, 373 [100 Cal.Rptr.2d 845] [counsel invited and consented to failure to instruct on lesser offenses in response to jury inquiry]; *People v. Thoi* (1989) 213 Cal.App.3d 689, 698 [261 Cal.Rptr. 789] [error invited or waived, where counsel "actively and vigorously lobbied against further instruction"]; *People v. Kageler* (1973) 32 Cal.App.3d 738, 746 [108 Cal.Rptr. 235] [where clarification would have adversely affected defense, failure to object had possible tactical motive and could be viewed as " 'tacit approval' "].) But this rule obviously cannot apply unless it appears that counsel was aware of the court's response at before the time it was effected. "Tacit approval" of the court's response, or lack of response, may be found where the court makes clear its intended response and defense counsel, with ample opportunity to object, fails to do so. (See *People v. Boyette* (2002) 29 Cal.4th 381, 430 [127 Cal.Rptr.2d 544, 58 P.3d 391].) At its furthest reach the rule has been held to justify a forfeiture where defense counsel sat mute while the court provided a response later challenged on appeal. (*People v. Roldan* (2005) 35 Cal.4th 646, 729 [27 Cal.Rptr.3d 360, 110 P.3d 289].) Here

defense counsel could not sit mute while the court refused to assist the jury, if only because he was not present.

Waiver has also been found where the court responds to an inquiry with a correct and germane statement of the law, and the defense proposes no further clarification. (*People v. Marks* (2003) 31 Cal.4th 197, 237 [2 Cal.Rptr.3d 252, 72 P.3d 1222].) But this obviously does not describe the present case, where the court affirmatively told the jury to use its own lay understanding of a term that in fact possessed, in law, a specific and inobvious meaning.

Respondent cites broad language in *People v. Litteral* (1978) 79 Cal.App.3d 790, 796 [145 Cal.Rptr. 186], that failure to object to a violation of Penal Code section 1138 may effect a waiver, but that statement was a noncommittal dictum; the judgment there was reversed.

In sum, we see no justification in existing law to hold defendant to a "waiver" of the court's incorrect response to the jury's inquiry. The record fails to show that counsel knew how the court intended to respond to the question, let alone that counsel assented to that response, tacitly or otherwise. Counsel's failure to provide the correct answer to the jury's question did not excuse the court from its "primary duty" to do so. Defendant has not forfeited his objection to the court's error in failing to answer the jury's question about the meaning of "mutual combat."[17]

### 2. *Sufficiency of Evidence to Support Instruction*

The more difficult question is whether *any* instruction on mutual combat should have been given. Discussion of this issue is not strictly necessary to our decision if the erroneous answer by itself was sufficiently prejudicial to require reversal. However, the sufficiency of the evidence to warrant a mutual combat instruction is an issue that appears likely to arise again on remand. We will therefore address it. (See Code Civ. Proc., § 43; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 337, p. 378.)

A party is entitled to a requested instruction if it is supported by substantial evidence. (*Norman v. Life Care Centers of America, Inc.* (2003) 107 Cal.App.4th 1233, 1242 [132 Cal.Rptr.2d 765].) Evidence is "[s]ubstantial" for this purpose if it is "sufficient to 'deserve consideration by the jury,'

---

[17] Respondent also urges this court to exercise its discretion not to entertain the point, because defendant's appellate counsel neglected to raise it in his original brief. Indeed, counsel neglected to mention the jury's inquiry or the court's response to it. There can be no tactical reason for this oversight, and we therefore decline to tax defendant with its consequences. In accordance with Government Code section 68081, we invited the parties to brief the issue, and they have done so. We therefore consider the issue on the merits.

that is, evidence that a reasonable jury could find persuasive." (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8 [47 Cal.Rptr.2d 569, 906 P.2d 531].) At the same time, instructions *not* supported by substantial evidence should not be given. (*People v. Marshall* (1997) 15 Cal.4th 1, 39–40 [61 Cal.Rptr.2d 84, 931 P.2d 262].) "It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case. [Citation.]" (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129 [17 Cal.Rptr.2d 365, 847 P.2d 45].)

For the jury here to find defendant guilty as charged, it had to find *beyond a reasonable doubt* that defendant struck at least one blow against Toni that (1) was unlawful, i.e., not struck in self-defense (see *People v. Tewksbury* (1976) 15 Cal.3d 953, 963 [127 Cal.Rptr. 135, 544 P.2d 1335]; *People v. Banks* (1967) 67 Cal.App.3d 379, 384 [137 Cal.Rptr. 652]); and (2) caused serious or great bodily injury (Pen. Code, §§ 243, subd. (d), 245, subd. (a)(1)). For the prosecution to carry this burden by way of a mutual combat theory, it had not only to persuade the jury that the blows were struck in the course of a fight into which defendant and Toni mutually consented to join, but to persuade them of that fact beyond a reasonable doubt. This standard of proof must inform any evaluation of the sufficiency of the evidence to sustain such a finding. (See *People v. Kunkin* (1973) 9 Cal.3d 245, 250 [107 Cal.Rptr. 184, 507 P.2d 1392] [in reviewing sufficiency of evidence to support conviction, " 'The appellate court must determine whether a reasonable trier of fact could have found the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt.' "]; *Jackson v. Virginia* (1979) 443 U.S. 307, 318–319 [61 L.Ed.2d 560, 99 S.Ct. 2781] ["[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be . . . whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. . . . [Citation.] . . . [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Fn. omitted.)].)

Although the question is made difficult by some vague or equivocal testimony, we have concluded that on this record, viewed in its entirety, no reasonable juror could conclude beyond a reasonable doubt that defendant and Toni were engaged in "mutual combat" when he punched her.

The trial court, which twice saw the witnesses give their accounts of the incident, appeared to conclude both times that there was *no evidence* of mutual combat. In the first trial the court refused an instruction on that subject, evidently memorializing its reasons with the notation "refused[,] no evid[ence]." At the second trial the court seemed to reach the same conclusion, stating, "There's no mutual combat." There is no indication that the

court changed its mind on this point. Instead it agreed to give the instruction based upon the prosecutor's insistence that he required it *for tactical reasons*, i.e., to meet the defense theory concerning the lesser offenses of simple assault and battery. (See, *ante*, fn. 7.) In response to this rationale, the court said it would give the instruction "because of the lessers."

A party's wish to have the jury instructed on a certain point cannot be honored based only upon the party's desire to make rhetorical or tactical use of the instruction. As noted above, the necessary condition for giving a requested instruction is the presence of sufficient evidence to establish the facts whose existence it presupposes. Before reaching that question, however, we cannot help but note that the rationale offered by the prosecutor does not withstand the most casual critical scrutiny. The defense theory which so concerned the prosecutor rested on the premises that (1) defendant's first blow or combination of blows against Toni was struck in self-defense; (2) only that first blow was struck with sufficient force to sustain the charges of *aggravated* assault and battery; but (3) defendant may have committed simple assault or battery by continuing his counterattack after any apparent necessity for self-defense had passed.[18] The manifest tactical purpose of the defense strategy was to give the jury an outlet for its inevitable disapproval of defendant's conduct while inducing it to view defendant's first (and arguably only injurious) blow separately from the ensuing ones. If the tactic succeeded, the jury would acquit defendant of the aggravated charges, while finding him guilty of the lesser included offenses.

The doctrine of mutual combat could logically defeat the claim of *self-defense*, but it had no tendency to overcome the particular defense theory cited. It would overcome the contention that defendant was guilty of lesser included offenses only by establishing defendant's guilt of the *charged* offenses. That of course is what the prosecution had undertaken to do regardless of any particular defense tactic or theory. The doctrine of mutual combat was germane, if at all, to the claim of self-defense; it was made no *more* germane by the defense tactic of offering lesser offenses to the jury. Nor, obviously, could the instruction be justified on some kind of horse-trading rationale, as suggested by the prosecutor's comment, "If Counsel doesn't get the lesser[s], then I'm not asking for this instruction." In sum, any

---

[18] Defense counsel put the theory to the jury as follows: "[I]f you find that the self-defense instruction applies as to the initial punch or combination of punches that caused the fracture, you may determine that later conduct amounts to the misdemeanor lesser-included offenses of simple assault and simple battery."

"So if you determine that the only injury to Ms. Speiser was from that one punch and that first punch, but that the evidence seems to be that he was still on top of her before Henry grabbed him . . . , if you find that, is why you have the lesser-included offenses of an assault, where maybe he throws a punch and misses, or a battery, where maybe he hits her, but there's no damage to her at all."

suggestion that a mutual combat instruction was warranted "because of the lessers" is manifestly unsound.

Even if the instruction were made more theoretically applicable or more tactically valuable by defense tactics, that alone would not justify giving it to the jury. Nor can an instruction unsupported by the evidence be justified by a prosecutorial fear that jurors might stray from their charge. (*People v. Michaels* (2002) 28 Cal.4th 486, 531 [122 Cal.Rptr.2d 285, 49 P.3d 1032] [where no defense of necessity raised, error to instruct on limitations on that defense in order to assuage prosecutor's concern that "the jurors would on their own come up with such a defense and apply it in this case"].) As we have noted, the dispositive consideration is whether the instruction is supported by substantial *evidence*. Here, the mutual defense instruction was not.

Viewed most favorably to the prosecution, the evidence showed an exchange of belligerent comments culminating in an impulsive and unexpected blow by Toni to which defendant responded with a combination, flurry, or barrage of blows. There is simply not enough evidence for a reasonable juror to conclude beyond a reasonable doubt that when these blows were exchanged, both parties had formed the intent to engage in a fight. The transcript contains some evidence that would, standing alone, suggest a willingness on *defendant's* part to fight. Amy thought he responded to Toni's threats of getting somebody to take care of him by asking, "Why don't you do it?" All three eyewitnesses agreed that he said something about going behind the trailer to fight. It is doubtful that a reasonable juror could find beyond a reasonable doubt that either of these remarks constituted an earnest proposal to fight or expression of intent to do so. The first appears more in the nature of a rhetorical question than a serious proposition, and Amy acknowledged that the second might have been made in a "humorous" vein, as defendant testified it was.

Toni never contradicted this testimony; she was not asked whether defendant seemed in earnest, or whether she believed he was. Indeed, during the evidentiary phase of the trial, the prosecutor himself manifestly did not view the case as one of mutual combat. He made no attempt to establish that the parties were engaged in mutual combat by any definition. Quite the reverse; he sought to exclude evidence directly bearing on that issue. The only reference to "mutual combat" during the evidentiary phase of the trial occurred when defense counsel asked Officer Ray if he had inquired of Toni whether "she expected to be in a mutual combat when she got up and went towards Mr. Ross and smacked him?" Counsel, who presumably expected the officer's negative answer, posed the question as part of an effort to establish a lack of thoroughness in the officer's interrogation of witnesses. The prosecution had opened the door to such evidence by insinuating that defendant had

fabricated details of his testimony not included in the account he gave to Officer Ray. But if the case truly presented an issue of mutual combat, the prosecutor's relevance objection would have been properly overruled even without that rationale.[19]

At the same time, there was considerable evidence that defendant had no present intention or expectation of fighting with Toni. He directly so testified, saying that he "wasn't thinking about we were going to fight or anything. I just thought we were talking, to be honest. I mean, I didn't think she was that kind of woman . . . ." Toni gave him no apparent reason to expect a fight. She showed no sign of herself engaging in combat with him. Nor did defendant appear to be preparing to do so. Amy testified, and even Toni seemed to acknowledge, that defendant did not move towards Toni. Toni said that he was "pushing" or "pulling" his sleeve "up to his elbow." But insofar as this might otherwise support an inference of preparation to fight, Amy again cast serious doubt on it, testifying that defendant appeared not to be expecting the blow, and that when it landed he "took a couple steps back," she thought more from "shock" than from the force of it. Indeed it seems unlikely that Toni's blow would ever have landed on defendant's cheek—as it indisputably did, leaving a mark—had he been expecting it. Having received some training in boxing, it is difficult to believe that defendant could not have deflected the blow, particularly if, as the evidence strongly indicated, it was a slap rather than a punch.

Even if a reasonable juror could be satisfied beyond a reasonable doubt that defendant wanted to fight, the record presents no substantial evidence of a reciprocal willingness on Toni's part. A contrary finding is supported by overwhelming evidence. Toni flatly testified that she did not "want to fight him." Nor did she manifest an intention to fight by her words or conduct. Her own account had her steadfastly refusing defendant's invitations to fight, telling him instead to wait for her boyfriend, who would "talk to him about that," i.e., defendant's supposed "wanting to go out back and kick your ass . . . ." That she ultimately formed the intention to *hit* defendant is unquestioned. But her testimony had her walking up to him *with her glasses and cigarettes in one hand* and *slapping* him with the other. This is not the conduct of someone entering into "combat." A slap may have been a prelude to a *duel* in the days of matched pistols at 20 paces, but it is hardly the way one initiates serious hand-to-hand combat.

Admittedly, there is some evidence that, standing alone, could support an inference of an intent on Toni's part to fight. Amy testified that Toni's *demeanor* toward defendant was so "challenging" that Amy was "shocked"

---

[19] Perhaps even more remarkable is the prosecutor's assertion that the question was *vague.* The only vagueness we can detect inheres in the term "mutual combat."

by it. In response to highly leading questions, Amy acceded to the character-ization that it was "as if" she were "watching two men" "getting into it," and that Toni was issuing challenges "as if to a physical altercation . . . ." Asked if "[i]t was like, 'If you don't stop talking to me, we're going to get into it right here and now,' basically," Amy replied, "Something like that, yeah." But the only specific "challeng[e]" Amy ascribed to Toni was the threat to have somebody else "take care of" defendant. No witness suggested that Toni was threatening or offering to fight defendant herself.

We do not believe any reasonable juror faced with this evidence could conclude beyond a reasonable doubt that defendant and Toni at any time mutually agreed, consented, arranged, or intended to fight one another. Instead the evidence strongly suggests that the parties exchanged contemptu-ous remarks until Toni lost her temper and slapped defendant, whereupon he punched her back.[20] This is not "mutual combat" as that term has been explicated in California precedents. This does not mean that defendant was legally entitled to punch Toni. That was and remains a legitimate question for the jury. But the answer must hinge on whether defendant responded with reasonable force to avert a threat of violence against his person. There is no adequate basis here for a finding that defendant was at any time engaged in mutual combat with Toni.

D.  *Prejudice*

Defendant contends that the error requires reversal unless it is shown to be harmless beyond a reasonable doubt. This contention rests on the premise that the error "effectively removed . . . appellant's defense from the jury's consideration." The cases cited by defendant on this point hold that *"failure to instruct . . . on the defendant's theory* of the case, where there is evidence to support such instruction, is reversible per se and can never be considered harmless error." (*U. S. v. Zuniga* (9th Cir. 1993) 989 F.2d 1109, 1111, italics added; see *U. S. v. Mason* (9th Cir. 1990) 902 F.2d 1434, 1438.) Assuming the accuracy of this statement, we doubt its pertinence. The trial court here did not "fail[] to instruct" on a defense theory but gave an unwarranted and dangerously incomplete instruction on a *prosecution* theory in *rebuttal* of the defense.

■  Such authority as we have found indicates that failure to clarify the applicable law upon inquiry by the jury is ordinary error the effect of which is tested under the relatively lenient standard of *People v. Watson* (1956) 46

---

[20] There was evidence that Toni's temper was already frayed. She testified that when she arrived at the trailer around 3:00, Donny borrowed her car, ostensibly to deliver some ice to his mother. He may have been making a "beer run," but if so she was unaware of it at the time. When his absence grew protracted, Toni became upset about it. Amy described Toni as "kind of yelling and cursing about where the heck Donny was."

Cal.2d 818, 836 [299 P.2d 243]. (*People v. Solis, supra,* 90 Cal.App.4th at p. 1015.) Under that standard, an error warrants reversal "only if, 'after an examination of the entire cause, including the evidence' (Cal. Const., art. VI, § 13), it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred (*Watson, supra,* 46 Cal.2d 818, 836)." (*People v. Breverman* (1998) 19 Cal.4th 142, 178 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) A " 'reasonable probability' " for these purposes "does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility." (*People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888, 918 [119 Cal.Rptr.2d 1, 44 P.3d 949]; see *Strickland v. Washington* (1984) 466 U.S. 668, 693–694, 697, 698 [80 L.Ed.2d 674, 104 S.Ct. 2052] [for purposes of determining whether it is reasonably probable that defense counsel's deficient representation adversely affected outcome, "reasonable probability" does not mean "more likely than not," but merely "probability sufficient to undermine confidence in the outcome"].)

We find the likelihood that defendant would have achieved a more favorable result in the absence of the errors to be more than "merely a reasonable chance," and considerably more than an "abstract possibility." We begin with the fact that the jury in the first trial was unable to reach a verdict, and that its last communication before deadlocking was a question about self-defense.[21] That jury had apparently not heard the testimony of Dr. Kaufman, which strongly suggested that only defendant's opening blow (or combination) was struck with sufficient force to support the charged offenses of aggravated assault and battery. That testimony rendered it unlikely that a jury would sustain those charges if it found the opening blows to have been struck in self-defense. Again, for defendant to prevail on these points, the jury did not have to affirmatively conclude that he acted initially in self-defense, and that the first blows were the only ones struck with sufficient force to sustain the charges. It had only to entertain a *reasonable doubt* on those questions. The testimony of the sole independent eyewitness, Amy, strongly suggested that Toni attacked defendant unexpectedly. A properly instructed jury would have understood that defendant was entitled to defend himself if he actually and reasonably anticipated that a further blow—even a slap—was imminent. Defendant testified that Toni struck him twice. This was consistent with his statements to Officer Ray shortly after the incident, and was uncontradicted by any other witness. This evidence supported a reasonable doubt, at least, about whether he reasonably expected to be slapped again.

Respondent contends that the instruction was harmless because juries are said to ignore irrelevant instructions. (See *People v. Rollo* (1977) 20 Cal.3d

---

[21] The first jury submitted a note asking, "If action taken was self defense, are the battery and assault charges dropped, or can we still consider the act self defense and find the defendant guilty of one or the other charges or both."

109, 123 [141 Cal.Rptr. 177, 569 P.2d 771] [instructing on irrelevant point "is usually harmless, having little or no effect 'other than to add to the bulk of the charge' "].) Had the jury been properly instructed on the meaning of "mutual combat," and were the record otherwise silent on the subject, this supposition might obtain. A properly instructed jury would not find "mutual combat" on the present facts, and would therefore presumably ignore the instruction. But the jury here was *not* properly instructed. It was left to suppose that the instruction might apply to *any* exchange of blows. Moreover the record affirmatively shows that jurors did not ignore the instruction. They petitioned the court in vain to clarify it. This fact turns respondent's generalization on its head: the very fact that jurors did not ignore the instruction suggests that they misunderstood it in precisely the way we have outlined, and thus misapplied it to improperly disqualify defendant from asserting a right to defend himself.

Respondent further contends that any error was harmless because "[t]he overwhelming evidence established [that] appellant's response to a slap in the face was grossly disproportionate." This assertion does not fully meet the issue, because a properly instructed jury could well agree with it and still not find defendant guilty of the aggravated offenses for which the court sentenced him to life in prison. This was precisely the defense strategy we have outlined, i.e., to permit the jury to find that defendant exceeded the scope of lawful self-defense, and thus committed simple assault and battery, by continuing to hit Toni, or attempt to do so, after his first blow or blows—which were justified self-defense—had clearly rendered her *hors de combat*.

Respondent apparently means to allude to the possibility that the jury could reject the plea of self-defense in its entirety if it found that defendant used excessive force *ab initio*. Most of the cases involving questions of excessive force consider the use of *lethal* force in response to a nonlethal attack. (See, e.g., *People v. Gleghorn* (1987) 193 Cal.App.3d 196, 202 [238 Cal.Rptr. 82] [victim may have responded unreasonably to simple assault by shooting defendant with bow and arrow, but defendant continued to beat victim long after necessity had passed]; *People v. Clark* (1982) 130 Cal.App.3d 371, 380 [181 Cal.Rptr. 682] [defendant shot victim who intended to " 'beat him up' "], disapproved on another point in *People v. Blakeley* (2000) 23 Cal.4th 82, 92 [96 Cal.Rptr.2d 451, 999 P.2d 675]; *People v. Heffington* (1973) 32 Cal.App.3d 1, 14 [107 Cal.Rptr. 859] [defendant used knife in defending against assault with fists]; *People v. Harris* (1971) 20 Cal.App.3d 534, 537 [97 Cal.Rptr. 883] [defendant shot victim]; *People v. Lewis* (1969) 1 Cal.App.3d 698, 702 [81 Cal.Rptr. 900] [same]; *People v. Garcia* (1969) 275 Cal.App.2d 517, 523 [79 Cal.Rptr. 833] [assuming defendant could be found to act in self-defense in resisting victim's efforts to disarm him, shooting the victim with an arrow was excessive force]; cf. *People v. Beyea* (1974) 38 Cal.App.3d 176, 190 [113 Cal.Rptr. 254] [two defendants fatally beat and kicked victim

at length; jury "could well conclude" that they "used excessive force and continued to do so long after the decedent had been disabled"].) We are not asked to decide under what circumstances, if any, a single punch or combination of punches may be found to constitute an excessive response to avert a second or third slap. There is reason to doubt that the jury ever reached the question, since it was apparently distracted, and its deliberations were quite possibly determined, by the mutual combat instruction.

■ We note that in his argument to the jury on this point, the prosecutor conflated defendant's *conduct* with the *consequences* it produced: "Even if you believe that she was going to slap him again, you'd also have to find that his response was reasonable to an objective and reasonable person in the same or similar circumstances. *He responds by breaking bones in her face*." (Italics added.) But punching one's assailant in the face is not like shooting him in the head or stabbing him in the heart. The test is not whether the force used appears excessive in hindsight but whether it appeared reasonably necessary to avert threatened harm under the circumstances at the time. The law grants a reasonable margin within which one may err on the side of his own safety, and so long as he is found to have done so reasonably, no abuse of the right of self-defense should be found to have occurred. A leading forms book makes a similar point in a proposed jury instruction: "[I]n using force in self-defense, a person may use only that amount of force, and no more, that is reasonably necessary for that person's protection. However, since in the heat of conflict or in the face of an impending peril a person cannot be expected to measure accurately the exact amount of force necessary to repel an attack, that person will not be deemed to have exceeded his or her rights unless the force used was so excessive as to be clearly vindictive under the circumstances. Thus, a person's right of self-defense is limited by the reasonableness of his or her belief that such force was necessary at that time and under the particular circumstances." (2A Am. Jur. Pleading and Practice Forms (2000), Assault and Battery, § 164, pp. 516–517; see *Com. v. Watley* (1997) 548 Pa. 574, 581 [699 A.2d 1240, 1243] [jury instructed in part, "A Defendant is entitled to estimate the necessity for the force he employs under the circumstances as he reasonably believes them to be at the time."]; *Hommer v. State* (Okla.Crim.App. 1983) 1983 OKCR 2 [657 P.2d 172, 174] ["It would be absurd to anticipate that a defendant could calculate a mathematically accurate quantity of force essential to do no more than repel an attack, at the moment of the attack"].)

Here the prosecution had a strong argument that defendant's response to Toni's blow was excessive at least in duration. Whether it was excessive *ab initio* was a question entrusted to the jury. Unfortunately it does not appear from this record that the jury ever reached that question. Instead it is entirely likely that the case was decided on the basis of a mistaken understanding of "mutual combat."

DISPOSITION

The judgment is reversed.

Premo, J., and Elia, J., concurred.

Respondent's petition for review by the Supreme Court was denied January 16, 2008, S158026.