Filed 8/11/14  P. v. Gunning CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br>KEVIN C. GUNNING,<br><br>    Defendant and Gunning. | A135879<br><br>(Contra Costa County<br>Super. Ct. No. 05-111512-0) |

Appellant Kevin C. Christopher Gunning shot and killed David Westly Johnson. Gunning claimed he shot Johnson in self-defense.  He was convicted by jury of first degree murder.  Gunning complains that the trial court erred in instructing the jury that his right to self-defense was limited if he engaged in "mutual combat" or if he started a fight.  We conclude that any instructional errors were harmless and affirm the judgment.

## I.    BACKGROUND

Gunning was charged by information with the premeditated first degree murder of Johnson on April 25, 2011.  (Pen. Code, § 187, subd. (a).)[1]  It was alleged that he personally and intentionally discharged a firearm while committing the crime, causing great bodily injury and death.  (§ 12022.53, subds. (b), (c), (d).)  The case was tried to a jury.

---

[1] All further undesignated statutory references are to the Penal Code.

1

A.    *Prosecution Witnesses*

In April 2011, Renee Rogers[2] was living in a house on Pinenut Way in Antioch (the Pinenut house) owned by Ron Savage, who lived there with Renee and Johnson, his stepson.  Renee had been Gunning's girlfriend "off and on" from about May 2009 to March 2011.  Gunning sometimes lived with Renee at the Pinenut house.  Gunning also had another girlfriend named Stacey Rabensteine who lived in a nearby house on Trembath Lane in Antioch (the Trembath house or Rabensteine's house).  In early March 2011, Johnson and Gunning got into a fistfight at the Pinenut house, after Gunning had learned that Renee and Johnson had had a sexual relationship.  Savage had to break up the fight twice before Gunning left the house with a bloody nose.  Gunning moved out of the Pinenut house after the incident.

On the evening of April 25, 2011, Renee, her sister Sarah, and Sarah's boyfriend Peneric "Nick" Harts were watching a movie in Renee's bedroom located at the front of the Pinenut house.  Johnson was watching a different movie in the living room, sitting in a white chair.[3]  At about 9:00 p.m., Gunning put his head through Renee's open bedroom window and said, "What's up?" then went to the front door of the house.  Renee testified that she left the bedroom and opened the front door, expecting to talk to Gunning in the doorway, but Gunning walked directly into the living room and stood in front of Johnson.  Renee asked Gunning what he was doing because his body language seemed aggressive, but he ignored her.  She followed him into the living room.  Gunning stood over Johnson, who remained seated in the white chair, and spoke menacingly.  He asked Johnson if he "thought it was funny" or if he thought it was okay to hit him.  Johnson was "very docile and glassy" and he did not make eye contact with Gunning or respond.  Renee did not see any weapons near Johnson and she did not see Johnson move or leave his chair.  Gunning

---

[2] To avoid confusion with later references to Renee's sister, Sarah Rogers, we shall refer to each by first name only.  No disrespect is intended.

[3] The witnesses often referred to this white chair as a "white couch."  There was also a longer dark-colored couch in the living room referenced in the testimony.  For clarity, we refer to the smaller, white piece of furniture as the white chair or chair and the larger, dark-colored piece of furniture as the dark couch or couch.

pointed a gun at Johnson with his right hand. Renee asked Gunning what he was doing and Gunning turned around and gestured for her and Sarah (who had walked into the living room behind her) to leave. Renee and Sarah returned to Renee's bedroom and Renee shut the door. Sarah began to flee through the bedroom window, and Renee heard two gunshots as she did so. Renee then heard a third gunshot and crawled out the window as well. It all happened "very, very quickly." Renee called 911.[4] When Gunning exited through the front door, Renee approached him and asked what he had done. He told Renee he loved her and "all of you," and then walked away. Renee then entered the house with Savage, who had come to the front door, and they administered cardiopulmonary resuscitation (CPR) to Johnson, but after 30 seconds he was unresponsive. About seven minutes later, police arrived.

Sarah testified that after Gunning put his head through the bedroom window, Renee went to talk to him. Sarah heard Renee say loudly something like, "What are you doing?" or "Stop," and was concerned so she went to the living room. She saw Johnson still sitting in a "laid back down" position in the white chair, looking calm. Gunning was sitting on the arm of the dark couch, facing Johnson. Gunning stood, turned, and told Sarah and Renee twice in an unfriendly tone to "get the fuck out of here" as he waved them away with a gun in his hand. Sarah and Renee quickly returned to Renee's bedroom, and Sarah heard Gunning say, "You think this is funny; you think this is funny." She did not hear Johnson say anything and she had not seen him do anything or see a weapon around him. In the bedroom, Sarah heard a gunshot and then a second gunshot. She crawled out of Renee's bedroom window and ran across the street, trying to dial 911 as she did so. As she was running, she heard two more gunshots.

Harts testified that, after Renee left her bedroom, Gunning entered the living room and argued with Renee and Johnson. Johnson was laughing and Gunning said angrily, "You think this is funny; you think this is funny." Johnson responded, "I'm not laughing.

---

[4] Renee was on the phone with 911 when she heard "the second shots" and she told the dispatcher about the shots as they occurred.

3

I'm not laughing." Harts saw Johnson seated in the chair and Gunning standing over him. Gunning held a gun in his right hand, with the barrel pointed at Johnson. Gunning then waved the gun at Sarah, Renee and Harts and told them to leave. Harts did not see Johnson move and did not see a weapon near him. Before he left the living room, Harts heard a gun being cocked. Harts fled the house and heard gunshots as he was crossing the front lawn and again when he reached the other side of the street. He saw Gunning talk to Renee on the front lawn of the Pinenut house and heard one of them say, "I love you." Renee started walking around in circles and Gunning ran toward a nearby cemetery, still carrying his gun.

Savage testified that he was in his bedroom in the back of the house watching television. At about 9:15 or 9:30 p.m. when he heard two loud "pops" separated by about a second. After some hesitation, he entered the living room and saw Johnson lying face down with a bullet wound in his back, moaning. He and Renee, who had entered the house, turned Johnson over and began administering CPR, but Johnson never again showed any signs of life.

Antioch Police Officer John Fortner conducted the search for Gunning. A search dog picked up a scent trail near the Pinenut house that led to the south end of Trembath Lane near Rabensteine's house. Police set up surveillance. About an hour later, Gunning climbed over a nearby fence and walked toward Rabensteine's house in a crouched position as he looked around him in all directions. Fortner shined a light on Gunning, identified himself as a police officer, and repeatedly ordered Gunning to get on the ground. Gunning resisted efforts by Fortner to restrain him. Gunning did not have a gun in his possession.

B.    *Gunning's Testimony*

After his March 2011 fight with Johnson, Gunning moved out of the Pinenut house and into the Trembath house with Rabensteine. However, he wanted to renew his relationship with Renee and he thought he needed to sort things out with Johnson in order to do that. On April 25, 2011, Gunning went to the Pinenut house to talk to Johnson. He brought his fully loaded .40 caliber Glock firearm with him because he was afraid

4

Johnson would attack him again, but he intended only to talk to Johnson, not shoot him. After Renee "invited [him] in," he could see from the front door that Johnson was sitting in the living room watching television. Gunning walked into the living room and noticed that Renee and Sarah had followed him. He told Renee and Sarah to leave because he wanted to talk to Johnson alone. He told Johnson he wanted to "squash the problems" between them and he took his gun out of his pocket and put it on the couch to show Johnson he did not want to be attacked again. He then sat on the couch. He did not point the gun at Johnson and he never asked Johnson if he thought "it was funny." Gunning got up to turn the TV down, and saw Johnson had a knife that he had on the chair and he started to come towards Gunning, so Gunning picked the gun up and shot twice. He fired the gun because he feared for his life. Johnson fell to the floor. "It happened so fast." Gunning initially testified that Johnson was standing when he saw him with the knife, but later testified that he was "crouched lunging at me," "leaning forward like low but leaning forward, coming at me." He said he pulled the trigger twice in rapid succession from about three or four feet away from Johnson, and that he intended to stop Johnson, but not to kill him.

When Gunning walked outside he did not believe Johnson was dead. He was "scared of what had just happened, in shock." After talking to Renee, he left through a wooded area and went toward the Trembath house. While in the wooded area, he put the gun down because he was scared and did not want to be holding it anymore. In later testimony, he said he hid for about two hours in the open space and he covered his gun and cell phone with a pile of bark. He took the back way to Trembath, which required him to scale a fence, and while he did not intentionally resist arrest he might have grabbed an officer's belt. He was "drained," which could explain his altercation with the officers.

Gunning admitted that he had a 2007 felony conviction for possession of a concealed firearm. (Former § 12025, subd. (b)(6); see Stats. 1999, ch. 571, § 2.) Following that conviction, he bought a gun from a friend and was known to carry a gun.

5

Gunning introduced evidence of prior violent acts committed by Johnson against Gunning, Renee and others.  In rebuttal, the prosecution introduced evidence of prior violent acts by Gunning and evidence that Gunning had attacked two fellow inmates since his arrest and incarceration.

C.      *Physical and Expert Evidence*

Antioch Police Detective Santiago Castillo secured the Trembath house the night of the incident and searched it the following morning after obtaining a search warrant.  In the master bedroom he found Gunning's wallet on the dresser, mail addressed to Gunning in the kitchen, and men's clothing in the closet.  He also found a partially empty box of .40 caliber ammunition in a table by the bed of the master bedroom and a live .40 caliber bullet by the bed in the spare bedroom.  A firearms expert testified that two spent bullet casings retrieved from the crime scene were from .40 caliber Smith & Wesson jacketed hollow point bullets manufactured by Winchester and fired from the same Glock firearm. The partial box of ammunition contained the same kind of bullets, four of the six cartridges had been cycled in the same firearm as the spent cartridges, and the other two may have been cycled in the same firearm.

Antioch Police Detective James McMurry gathered evidence from the crime scene.  He located two spent bullet casings on the living room floor.  One was by Johnson's right foot near the blue couch and the other was by the sliding glass door. When McMurry first saw the white chair, the seat cushion was in place and a remote control and a red cell phone were on the arm of the chair by a propped-up pillow.  He pulled out the seat cushion and saw a knife that was 12.5 inches long with an eight-inch blade.

Dr. Ikechi Ogan described the autopsy.  Johnson had two gunshot entrance wounds, one in the left chest and one in the back, and no exit wounds.  The wounds were inflicted very close in time and while Johnson was still alive, but he could not determine which was inflicted first.  There was no evidence on the skin around the wounds consistent with the shots having been fired at close range (18 inches or less).  The bullet that entered the front left chest followed a trajectory across and downward to the rear

6

right lower chest. Ogan classified this as the fatal wound. The other bullet entered the lower back about 10 inches below the front entrance wound and just to the left of center. It travelled from back to front in a slight downward direction. Johnson had abrasions and contusions (scrapes and bruises) on his left shoulder, his left back, his left upper arm, around the left ear, and on the side of the head, but no underlying fractures. The gunshot wounds, abrasions and contusions had all occurred at about the same time. Ogan concluded the superficial injuries were consistent with a "terminal fall," i.e., the "final collapse of the person, if they were standing or trying to stand or in any way elevated."

James Norris, a defense expert in crime scene reconstruction ballistics and firearm analysis, testified there was no evidence Johnson had been seated in the white chair when he was shot. The trajectory of the bullet that entered Johnson's chest suggested either that he was shot from above or that he was leaning forward while he was shot. The trajectory of the bullet that entered Johnson's back was consistent with his being shot while standing or while lying on the floor. Norris examined two bullet holes in Johnson's shirt and he did not observe any black staining or powder granules around the bullet wounds or holes that would indicate close-range firing.

D.      *Jury Instructions*

The prosecutor requested that the court give CALCRIM No. 3471, which is entitled "Right to Self-Defense: Mutual Combat or Initial Aggressor" and provides:

"A person who (engages in mutual combat/ [or who] starts a fight) has a right to self-defense only if:

"1 (He/She) actually and in good faith tried to stop fighting;

"[AND]

"2 (He/She) indicated, by word or by conduct, to (his/her) opponent, in a way that a reasonable person would understand, that (he/she) wanted to stop fighting and that (he/she) had stopped fighting(;/.)

"<*Give element 3 in cases of mutual combat.*>

"[AND

"3 (He/She) gave (his/her) opponent a chance to stop fighting.]

7

"If the defendant meets these requirements, (he/she) then had a right to self-defense if the opponent continued to fight.

"[However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend (himself/herself) with deadly force and was not required to try to stop fighting(,/ or) communicate the desire to stop to the opponent[, or give the opponent a chance to stop fighting].]

"[A fight is *mutual combat* when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose.]"

The defense objected, arguing the instruction "applies only when there's actual physical application of force," citing *People v. Ross* (2007) 155 Cal.App.4th 1033, 1045 and *People v. Johnson* (2009) 180 Cal.App.4th 702. The court agreed to give the instruction, explaining: "I do believe based on the testimony of the defendant that there's substantial evidence and a jury could conclude that the act of bringing the firearm into the home and then placing it on the couch with the sole purpose of making sure Mr. Johnson knew that Mr. Gunning was armed and not to start something with Mr. Gunning is sufficient to warrant 3471." However, the court said it would strike from the instruction "the language of mutual combat based on the discussion in *People v. Ross* that was cited by [defense counsel]." "[Defense counsel] argued rather persuasively that there was no mutual combat in this case . . . [b]ecause there was no physical contact and there was no evidence[] that the actions were mutual when it came to the use of force in this case." Specifically, the court struck "element number 3 of the instruction as well as the paragraph relating to the definition of when a fight is mutual combat," explaining, "elements 1 and 2 relate to a situation where a defendant claiming self-defense is the initial aggressor as classified in the instruction. And element 3 relates to an incident where there is mutual combat involved. [¶] . . . So I have stricken paragraph 3 as well as the mutual combat language at the end of the instruction." The defense lodged a general objection to the proposed modification.

8

In addition to other instructions on self-defense, the jury was instructed that:

"A person who engages *in mutual combat* or who starts a fight has a right to self-defense only if:

"1 He actually and in good faith tried to stop fighting;

"AND

"2 He indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting;

"However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting or communicate the desire to stop to the opponent, or give the opponent a chance to stop fighting." (Italics added.) The written instruction, also given to the jury, was captioned, "3471. Right to Self-Defense: Mutual Combat or Initial Aggressor."

E.  *Verdict and Sentence*

On May 23, 2012 , the jury convicted Gunning of first degree murder (§ 187, subd. (a)) and found he had personally discharged a firearm, causing death (§ 12022.53, subds. (b)–(d)). The court sentenced Gunning to 25 years to life imprisonment for the murder conviction, a consecutive term of 25 years to life for the section 12022.53, subdivision (d) enhancement, and stayed the terms for the other enhancements, imposing a cumulative sentence of 50 years to life.

## II.  DISCUSSION

Gunning argues the trial court erred in providing the modified CALCRIM No. 3471 instruction for three reasons:  first, there was no substantial evidence to support the references to "mutual combat" that remained in the instruction; second, the court failed to define "mutual combat"; and third, the court failed to define "person . . . who starts a fight."  We agree that it was error to utilize the instruction in the form given.  We conclude, however, that any errors were nonprejudicial.

9

A.    *Instructional Error*

"Homicide is . . . justifiable when committed by any person . . . [¶] . . . [¶] . . . in the lawful defense of such person . . . ; but such person, . . . if he was the assailant or engaged in *mutual combat*, must really and in good faith have endeavored to decline any further struggle before the homicide was committed."  (§ 197, subd. (3), italics added.) " '[M]utual combat' means not merely a reciprocal exchange of blows but one *pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities.*" (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1045 [reviewing cases].)  "[T]here must be evidence from which the jury could reasonably find that *both combatants actually consented or intended to fight before the claimed occasion for self-defense arose.*"  (*Id.* at p. 1047.)  Consistent with this authority, CALCRIM No. 3471 provides:  "A fight is mutual combat when it began or continued by mutual consent or agreement.  That agreement may be expressly stated or implied and must occur before the claim to self-defense arose."

As the trial court recognized, there was no evidence in this case of mutual combat, i.e., a prearrangement to engage in a fight, that would have supported a mutual combat instruction.  (See *People v. Ross, supra,* 155 Cal.App.4th at p. 1054 [evidence suggesting that the parties exchanged contemptuous remarks until one lost her temper and slapped defendant, who then punched her back, was "not 'mutual combat' as that term has been explicated in California precedents" (fn. omitted).)

Although the trial court concluded there was no evidence of mutual combat and deleted the related portion of the instruction, it inadvertently failed to delete the reference to "mutual combat" in the caption and in first sentence of the instruction.[5]  Because the

---

[5] The court also left in another phrase that appears to relate only to mutual combat. As provided to the jury, the final paragraph of the instruction stated:  "However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting or communicate the desire to stop to the opponent, *or give the opponent a chance to stop fighting*."  (Italics added.)  The italicized phrase is a reference back to element 3 of the

10

court deleted the definition of "mutual combat" from the instruction, the jury had no guidance on how to apply the phrase "mutual combat" which remained in the instruction. The legal meaning of the phrase is not self-explanatory. "The dictionary meaning of 'mutual' does not necessarily convey any particular intention on the part of persons whose conduct it is used to describe. It is defined as 'directed by each toward the other,' 'shared in common,' or 'joint' (Merriam-Webster's Collegiate Dict. (10th ed. 1999), p. 768), '[h]aving the same relationship to each other,' '[d]irected and received in equal amount,' or 'reciprocal' (American Heritage College Dict. (3d ed. 1997), p. 901). Thus any combat may be correctly described as 'mutual' so long as it is seen to possess a quality of reciprocity or exchange. In ordinary speech, then, 'mutual combat' might properly describe any violent struggle between two or more people, however it came into being." (*People v. Ross, supra,* 155 Cal.App.4th at p. 1044.)

Even if a mutual combat instruction had been supported by substantial evidence, therefore, the court erred in failing to define "mutual combat." (See *People v. Ross, supra,* 155 Cal.App.4th at p. 1049 [not necessary to determine whether it was error to provide mutual combat instruction where court erred in failing to define "mutual combat" for jury on jury's request].)

Gunning also argues that the court erred in failing to define the phrase "person . . . who starts a fight" in the instruction. He argues that the legal principle that underlies the instruction (and codified in § 197) applies only if the defendant is the initial *physical* aggressor, i.e., only if he initiates a *physical* confrontation. The trial court found the instruction applicable because, "based on the testimony of the defendant[,] . . . a jury could conclude that the act of bringing the firearm into the home and then placing it on the couch with the sole purpose of making sure Mr. Johnson knew that Mr. Gunning was armed and not to start something with Mr. Gunning" made Gunning the initial aggressor

standard instruction, which expressly applies only in cases of mutual combat and was not provided to the jury in this case: "3 (He/She) gave (his/her) opponent a chance to stop fighting." (CALCRIM No. 3471.) Gunning does not draw attention to this phrase in the instruction and its inclusion in the instruction does not alter our analysis.

within the meaning of the instruction. That is, the trial court apparently understood the instruction to apply even if the defendant did not initiate a physical conflict, as long as the defendant initiated a confrontation while armed or perhaps with conduct or gestures that indicated he was prepared to use physical force.[6] The prosecution argued that Gunning was the "initial aggressor," and not entitled to self-defense, because he went to Johnson's house with a loaded firearm and "display[ed]" or "brandish[ed]" it.

The authorities cited by the parties on appeal do not clarify whether initial *physical* aggression by the defendant is required. (See § 197, subd. (3) [in homicide cases, rule applies to person who was "the assailant or engaged in mutual combat" and who failed "to decline any further struggle"]; *People v. Ross, supra,* 155 Cal.App.4th at p. 1043, fn. 12, quoting § 197, subd. 3; *In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1 [self-defense doctrine unavailable to "a defendant who, through his own wrongful conduct (*e.g., the initiation of a physical assault* or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified" (italics added); 1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Defenses, § 78 [rule applies to "person who wrongfully attacks, or who voluntarily engages in a fight"]; CALCRIM No. 3471 (2007–2008 ed.) ["A person . . . who is the first one to use physical force has a right to self-defense only if: . . . ."]; CALCRIM No. 3471 (2008 ed.) ["A person . . . who is the initial aggressor has a right to self-defense only if: . . . ."]; CALCRIM No. 3471 (2012 ed.) ["A person . . . who starts a fight has a right to self-defense only if: . . . ."].)

The fact that a defendant pointed a weapon at the victim may be sufficient to trigger the initial aggressor exception to the self-defense doctrine. (See *People v. Bolton* (1979) 23 Cal.3d 208, 215 [appellant was clearly the aggressor in a quarrel when "[h]e pointed his gun at Hollister at a time when Hollister made no immediate threat against him. When Hollister reached as for a gun, appellant as the aggressor was bound to retreat

---

[6] Gunning did not ask the court to define the phrase "person . . . who starts a fight." We assume for purposes of argument that his general objection to the instruction is sufficient to preserve his claim.

and not to stand his ground"]; *People v. Garcia* (1969) 275 Cal.App.2d 517, 523 ["after an argument and defendant's challenge to fight [defendant] went back with [a] bow and arrow with the intent to commit an assault on [the victim] and in fact carried out this intention while [the victim] was trying to disarm [defendant] to protect himself, by shooting the arrow from the bow . . ."].)  While Gunning claimed that he only displayed the weapon and never pointed it at Johnson until Johnson lunged at him, both Renee and Harts testified that that Gunning pointed the gun at Johnson during a heated discussion—evidence of at least a brandishing of the weapon (§ 417, subd. (a)(2)), if not an assault. We would consider this sufficient evidence that a jury could find Gunning to be the "initial aggressor."  We need not decide, however, whether a definition of "starts a fight" is necessary in these circumstances because we find that any error in the instruction was clearly harmless.

B.      *Prejudice*

Here, as in *People v. Ross*, the "[d]efendant contends that the error requires reversal unless it is shown to be harmless beyond a reasonable doubt.  This contention rests on the premise that the error 'effectively removed . . . appellant's defense from the jury's consideration,' " and lightened the prosecutions' burden of proving beyond a reasonable doubt that Gunning did not act in self defense. (*People v. Ross, supra,* 155 Cal.App.4th at p. 1054.)  Like the *Ross* court, we conclude the instructional error before us did not implicate Gunning's federal constitutional rights because "the trial court here did not 'fail[ ] to instruct' on a defense theory but gave an unwarranted and [arguably] incomplete instruction on a prosecution theory in rebuttal of the defense." (*Ibid.*)  A mere "failure to clarify the applicable law upon inquiry by the jury is ordinary error the effect of which is tested under the relatively lenient standard of *People v. Watson* (1956) 46 Cal.2d 818, 836.  [Citation.]  Under that standard, an error warrants reversal 'only if, "after an examination of the entire cause, including the evidence" (Cal. Const., art. VI, § 13), it appears "reasonably probable" the defendant would have obtained a more favorable outcome had the error not occurred [citation].'  [Citation.]  A ' "reasonable

probability" ' for these purposes 'does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility.' " (*Id.* at pp. 1054–1055.)

We first find no reasonable probability that the jury found, as Gunning argues, that he had no right to defend himself from a knife attack by Johnson because he and Johnson had engaged in mutual combat on a prior occasion (the fight that resulted in Gunning's bloody nose). The prosecutor made no "mutual combat" argument in closing and discussed the CALCRIM No. 3471 instruction only in terms of Gunning's role as an initial aggressor. The fight between Gunning and Johnson that left Gunning with a bloody nose was mentioned by the prosecution only as evidence of Gunning's motive to murder Johnson, and by the defense as evidence of Gunning's reason to fear Johnson, not as evidence that Gunning had forfeited his right to self defense by reason of that prior fight.

We also find no reasonable probability Gunning would have obtained a more favorable result had CALCRIM No. 3471 not been given. The evidence against Gunning was strong. Three witnesses saw him walk up to Johnson as soon as he entered the house and then stand by him with a gun in his hand. Gunning admitted he walked up to Johnson and he took out a gun while he positioned himself right next to Johnson. The witnesses said they heard Gunning make apparently hostile statements to Johnson. Gunning admitted he went to the house to get things "squared off" with Johnson. The witnesses said that Gunning waved Renee and Sarah out of the room, and Gunning admits he told them to leave. The witnesses said they heard gunshots very quickly after Renee and Sarah left the living room, and Gunning acknowledged on the witness stand that the incident unfolded very quickly. Gunning's actions after the incident support an inference of consciousness of guilt: he did not claim he acted in self-defense when Renee asked him about the shooting as he was leaving the house; he went to an unpopulated area and hid for about two hours before going to the Trembath house; he hid his gun and cell phone; he approached the Trembath house stealthily, jumping a fence and crouching; and he resisted arrest.

14

Moreover, the jury unequivocally rejected Gunning's claim that he killed Johnson only in response to Johnson's aggression. The jury was instructed on first and second degree murder, and on voluntary manslaughter under theories of provocation and of "imperfect self-defense," in addition to the general instruction on self-defense. The jury was told that provocation could reduce a murder from first to second degree, or from murder to voluntary manslaughter. The jury was also told that, while Gunning would not be guilty of any unlawful homicide if he necessarily acted in self-defense, he would only be guilty of voluntary manslaughter if he acted in a unreasonable belief that the use of deadly force was necessary. In returning a verdict of first degree murder, and rejecting any lesser verdict, the jury found beyond a reasonable doubt that the killing was not only unlawful, but that Gunning did not have even an unreasonable belief in the need for self-defense. In finding that the killing was premeditated and deliberate—findings completely inconsistent with Gunning's version of events—the jury's verdict makes clear that any instructional error was harmless.

### III. DISPOSITION

The judgment is affirmed.

_____
Bruiniers, J.


We concur:


_____
Jones, P. J.


_____
Needham, J.


15