Filed 1/22/16  P. v. Fortner CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL FORTNER,<br><br>    Defendant and Appellant. | H040874<br>(Monterey County<br>Super. Ct. No. SS112116) |

Defendant Michael Fortner was convicted by jury trial of inflicting corporal injury on a spouse (Pen. Code, § 273.5, subd. (a)),[1] aggravated assault (§ 245, subd. (a)(1)), and three counts of violating a criminal protective order (§ 166, subd. (c)(1)).  The jury also found true an allegation that he had personally inflicted great bodily injury (§ 12022.7, subd. (e)) in the commission of the aggravated assault.  The court imposed a nine-year prison sentence.  On appeal, defendant's sole contention is that the trial court prejudicially erred in instructing the jury with CALCRIM No. 3471 upon defendant's trial counsel's request.  We find no cause for reversal.

---

[1]    Subsequent statutory references are to the Penal Code unless otherwise specified.

# I.  Factual Background

Jane Doe started dating defendant in 2009.  In April 2010, they went to Hawaii together to visit Doe's family.  A couple of weeks before they went to Hawaii, they argued about defendant's communications with a prostitute.  Defendant apologized, and Doe forgave him.  While they were in Hawaii, defendant got "drunk" and became "loud and obnoxious and rude" while they were out to dinner with Doe's aunt and uncle.  Doe went back to the hotel, and defendant returned later.  They argued, "the prostitution thing came up again," and defendant called Doe "an ugly, fat cow."  She told him to shut up, but he continued to call her "an ugly, fat cow," said "that the hooker was hotter" than Doe, made "cow sounds," and asked Doe if she "wanted any curd."

The following day, Doe went out and got a "makeover."  A couple of days later, a woman told Doe that she was "very beautiful."  Doe responded:  " 'Thank you very much. That means a lot to me, because just last night I was called an ugly, fat cow.' "  When Doe and defendant went back to their hotel room, defendant complained about Doe's comment to the woman.  This instigated another argument about defendant's earlier comments and about the prostitute.  Defendant took Doe's phone and threw it off the balcony.  Doe tried to do the same to defendant's phone, but defendant kept his phone away from her.  There was a "tussle" over defendant's phone.  He pushed her, and she fell down.  She got up and threw a mug at defendant.  The mug missed defendant and shattered on the floor.  Defendant became very angry and punched Doe in the eye.

Doe apologized and asked defendant not to hit her again.  She saw his fist near her face, and then she woke up on the floor in pain and confused.  Defendant left the room. Doe tried to follow him, but she was confused and having trouble seeing.  When defendant returned, he blamed Doe for provoking him.  Doe apologized for upsetting him.  They soon returned to California.  When they got back, Doe asked defendant to take her to the emergency room, but he refused.  A few days later, she went to the hospital due to the problem with her eye and pain in her chest.  Doe underwent two

2

surgeries on her eye, but her vision could not be restored. She continued to have pain in her chest from the Hawaii incident because she had a broken sternum.

Defendant "seemed" apologetic and remorseful, and he said he would stop drinking. He proposed marriage to Doe, and she accepted. In June 2010, they began living together, and they married in September 2010. A couple of months after they married, they resumed arguing. Doe tried not to upset defendant, and she would respond to arguments by going to her room or leaving the house. After a year of marriage, during which the arguments became more frequent, Doe asked defendant to go to counseling with her and suggested that the alternative was divorce. Defendant refused to go to counseling. They continued to argue and call each other nasty things. Doe threw a pen and a headset at him during arguments, but she never hit him. Defendant had returned to drinking, and Doe was considering leaving him.

On Friday, November 4, 2011, Doe was delayed at work. She had a beer with a coworker after an extended work day and then texted defendant that she was on her way home. Defendant replied "'don't bother.'" Doe arrived home at about 10:00 p.m., but she could not get into the house because defendant was holding the door closed. She finally gained entry when defendant walked away from the door. He asked where she had been, and she apologized and tried to explain. Defendant, who had been drinking, accused her of lying and cheating and called her names. Doe told defendant "'I've hit my limit. I'm done.'" She was sitting on a bar stool in the kitchen as she told defendant, who was sitting on the couch in the living room, that she was leaving him. Doe mentioned divorce and threw her wedding ring toward defendant but did not hit him with it.

Defendant got up and walked away. Doe got up and took a seat on the armrest of the couch. Defendant returned, pushed her down on her back on the couch, straddled her, put his hands around her throat, and began strangling her. Doe lost consciousness. When she regained consciousness, defendant was still on top of her and still had his hands

3

around her throat. She felt pressure on her throat and lost consciousness again. Doe returned to consciousness after feeling what she thought was someone slapping her face.

Doe, who had her eyes closed, heard defendant "pacing," heard him say " 'Get the fuck out,' " and felt something hit her. She got up and walked toward the door. She was shaky, lightheaded, and confused, and her vision was blurry. Doe told defendant that she was leaving. He said: " 'If you tell your kids about this and they come here, don't think that I won't stop with them like I stopped with you.' " Doe asked him "why he did that," and defendant said that she "needed to be taught a lesson and that those are [her] consequences." Because she feared for her sons, she apologized for upsetting him.

Defendant had his jacket on and said he was leaving. Doe did not want him to drive drunk and hurt someone else. She told him not to go and tried to stop him from leaving by holding and pulling on his jacket. Defendant told her to let go and pushed her away. She grabbed his jacket again. Somehow they ended up on the floor with him on top of her. Defendant again put his hands around Doe's neck. He asked her if she "wanted to go out again," and she pleaded with him to get off of her because it was hurting her injured chest. Defendant increased the pressure on her chest. Doe again pleaded with him to stop, and he got up and told her again to " 'get the fuck out.' " Doe repeatedly apologized. Neither of them left the house; defendant and Doe slept in separate rooms that night. She did not call the police because she was scared and embarrassed.

The next day, Doe noticed that she had injuries to her face and head. Her chest hurt, and it was difficult to swallow. Doe told a friend and defendant's mother about the incident, and they both encouraged her to call the police. Doe reported the incident to the police on November 7, 2011. The police obtained an emergency protective order for her that day barring contact including through a third party, and the order was served on defendant. The emergency protective order and a subsequent restraining order barred defendant from telephoning Doe. Defendant telephoned her on November 10. He called

4

her twice more in the following week. During one of these calls, defendant mentioned that "he knows that he's not supposed to call." Defendant also contacted his father and had his father contact Doe.

## II. Procedural Background

Defendant was charged by amended information with attempted murder (§§ 187, subd. (a), 664), torture (§ 206), inflicting corporal injury on a spouse, aggravated assault, false imprisonment by violence (§§ 236, 237), and three counts of violating a criminal protective order. It was further alleged that in the commission of the attempted murder and the aggravated assault defendant had personally inflicted great bodily injury.

The prosecutor and the defense stipulated that defendant had called Doe three times after being served with a valid restraining order, and defendant's trial counsel conceded in closing argument that defendant was guilty of those three counts. The jury returned guilty verdicts on the inflicting corporal injury, aggravated assault, and violating a criminal protective order counts, and it found the personal infliction allegation true as to the aggravated assault count. Defendant was acquitted of the remaining counts. The court imposed a nine-year prison sentence, and defendant timely filed a notice of appeal.[2]

## III. Discussion

The sole issue on appeal concerns the trial court's instruction of the jury with CALCRIM No. 3471 on mutual combat. Defendant claims on appeal that the trial court prejudicially erred in giving this instruction as it was not supported by substantial evidence. Since it was defendant's trial counsel who requested this instruction and the court gave it over the prosecution's objection, the Attorney General contends that any

---

[2] At the sentencing hearing, defendant's trial counsel told the court: "Mr. Fortner had, from Day 1, been willing to plead to exactly what he was found guilty of."

5

error in giving the instruction was "invited error." Defendant claims that his trial counsel's request did not invite the court's error in giving the instruction because his trial counsel did not express any strategic reason for her request. He also argues that his trial counsel's request was prejudicially deficient.

## A. Background

The prosecutor did not request CALCRIM No. 3471. In its trial brief, the defense requested both CALCRIM No. 3470 (self-defense) and CALCRIM No. 3471. On cross-examination, Doe conceded that at the preliminary examination she had testified that she was "pulling on him, grabbing him to keep him from leaving" "before anything physical happened." However, she testified at trial that she remembered the incident more clearly now and that the pulling and grabbing of defendant's jacket occurred after defendant strangled her on the couch. During redirect-examination of Doe, the prosecutor noted, outside the presence of the jury, that her questions about Doe's reasons for trying to prevent defendant from leaving the house on November 4, 2011 were relevant because defendant's trial counsel was "making that [(Doe holding on to defendant's jacket)] into mutual combat."

At the instruction conference, the prosecution opposed "any instructions on self-defense" on the ground that there was not substantial evidence to support such instructions. The defense relied on Doe's testimony that "she was grabbing my client's jacket and pulling on it to keep him from leaving." Defendant's trial counsel noted that Doe had testified at the preliminary examination that the pulling had occurred "before even the sofa incident." She claimed that Doe was falsely imprisoning and unlawfully touching defendant. She also mentioned Doe throwing her ring at defendant. The court granted the defense request for self-defense instructions.

The court instructed the jury that "[s]ome of these instructions may not apply, depending on your findings about the facts of the case. Do not assume, just because I

6

give a particular instruction, that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them."

The court instructed on self-defense. "Self-defense is a defense to Count 1, attempted murder, Count 3, inflicting injury on a spouse, Count 4, assault by means likely to produce great bodily injury, and the lesser included crimes . . . . The defendant is not guilty of those crimes if he used force against the person in lawful self-defense. The defendant acted in lawful self-defense if, one, the defendant reasonably believed that he was in imminent danger of suffering bodily injury or was in imminent danger of being touched unlawfully; two, the defendant reasonably believed that the immediate use of force was necessary to defend against that danger; and three, the defendant used no more force than was reasonably necessary to defend against that danger. [¶] . . . The defendant is only entitled to use the amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the defendant did not act in lawful self-defense. [¶] . . . [¶] A person who engages in mutual combat or who starts a fight has a right to self-defense only if, one, he actually and in good faith tried to stop fighting; two, he indicated by word or by conduct to his opponent in a way that a reasonable person would understand that he wanted to stop fighting and that he had stopped fighting; and three, he gave his opponent a chance to stop fighting. If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight. [¶] A fight is mutual combat, whether it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose. A person does not have the right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use force."

The prosecutor argued to the jury in her opening argument: "So there is a statement by Jane Doe at the preliminary hearing that she at some point holds on to his

7

jacket. Now, I'm sure the defense is going to use that to say it happened according to her testimony at the preliminary hearing, that she held on to him before any violence. And that's what started his right to self-defense. But if you think about it, her testimony, if she held on to his jacket, now, if she said the sleeve or the bottom of the jacket, if that occurred before the violence, it did not occur right before the violence. Meaning she held him by the jacket and then he put her down." "I submit to you that she actually held on to his jacket after the couch incident. Because that is what makes them go to the floor." "And if you think that the defense's theory about her holding on to his coat qualifies for that first prong, the analysis doesn't stop there. You need to go on. Say she did hold his coat before the unconsciousness on the couch. If she did, then you have to measure was his actions -- was the force he used reasonable? Ladies and gentlemen, if someone was holding on to your coat, the amount of force necessary to ward that off is not to render someone unconscious twice, to put your hand around their throat, stop their breathing."

"The fact that you don't want to hear what somebody else says or you don't like the words that somebody else says. Those words do not rise to provocation that allows for self-defense in this case. Words are not provocation. They're not mutual combat. . . . Holding on to him does not constitute mutual combat." "There's also a jury instruction about mutual combat. And it reads 'acted in good faith to stop fighting. Indicated in a way that a reasonable person would understand that a person wanted to stop fighting and had stopped fighting.' I submit to you that this doesn't apply. Mutual combat is fighting; meaning people are at blows with each other. We had no evidence of mutual combat. Someone holding on to a sleeve and someone knocking them unconscious does not qualify as mutual combat."

Defendant's trial counsel argued to the jury that Doe was "the aggressor even in Hawaii." "She's the one who starts attacking him to get the phone. She's the one grabbing on to him, trying to get that phone away from him. And she's the one who throws the cup." "If you find that Jane Doe threatened or harmed the defendant in the

past, you may consider that information in deciding whether the defendant's conduct and belief were reasonable." "[M]y client had a legal right then, and had a legal right in November, to stop her from abusing him." Defendant's trial counsel conceded that defendant had strangled Doe, but she argued that he did so only because Doe "was holding on to him when he wanted to leave" and "wasn't going to let him." "[S]he's grabbing him to keep him from leaving. Again, an assault, a battery, a false imprisonment on him. That we all have a legal right to stop." "Jane Doe didn't have a right to keep him from leaving." "We have a pattern that she attacks him, and that he has to do something to stop her." She argued that defendant's choking of Doe was not "unreasonable force." "[M]y client had a legal right to keep himself from being battered, from being assaulted, and from being falsely imprisoned."

In her closing argument, the prosecutor responded: "The law does not allow strangulation of anyone, man or woman, as a response for holding or grabbing on to a jacket."

## B. Invited Error

" '[T]he invited error doctrine will not preclude appellate review if the record fails to show counsel had a tactical reason for requesting or acquiescing in the instruction.' [Citation.]" (*People v. Moore* (2011) 51 Cal.4th 386, 410.) " 'The issue centers on whether counsel deliberately caused the court to [give or fail to give the instruction] . . . .' [¶] . . . [T]he record must show only that counsel made a conscious, deliberate tactical choice between having the instruction and not having it. If counsel was ignorant of the choice, or mistakenly believed the court was not giving it to counsel, invited error will not be found. If, however, the record shows this conscious choice, it need not additionally show counsel correctly understood all the legal implications of the tactical choice. Error is invited if counsel made a conscious tactical choice." (*People v. Cooper* (1991) 53 Cal.3d 771, 831 (*Cooper*).)

9

In this case, defendant's trial counsel deliberately requested CALCRIM No. 3470 and CALCRIM No. 3471. Prior to the instruction conference, the prosecutor noted that defendant's trial counsel was "making that [(Doe holding on to defendant's jacket)] into mutual combat." The version of CALCRIM No. 3471 given by the trial court was not limited to mutual combat. It also delineated the limits on the right to self-defense where a person "starts a fight." The prosecutor argued to the jury that CALCRIM No. 3471 was inapplicable. "Holding on to him does not constitute mutual combat." "There's also a jury instruction about mutual combat. . . . We had no evidence of mutual combat. Someone holding on to a sleeve and someone knocking them unconscious does not qualify as mutual combat." Defendant's trial counsel argued that defendant's strangling of Doe was simply his response to her "attack" on him.

The record before us reflects that defendant's trial counsel "deliberately caused the court to" give CALCRIM No. 3471. She explicitly requested the instruction. The prosecutor opposed the instruction, argued against it, and identified defendant's trial counsel's motivation to establish "mutual combat" as the basis for some of the prosecutor's questioning of Doe on redirect. Defendant's trial counsel did not disclaim that motivation. Although defendant's trial counsel did not expressly state on the record a tactical reason for requesting that CALCRIM No. 3471 be given in addition to CALCRIM No. 3470, the record is fully adequate to show that she knew that she had the choice whether this instruction would be given and exercised that choice in favor of having the court give the instruction. Where "the record shows this conscious choice, it need not additionally show counsel correctly understood all the legal implications of the tactical choice. Error is invited if counsel made a conscious tactical choice." (*Cooper*, *supra*, 53 Cal.3d at p. 831.) Defendant's trial counsel's conscious tactical choice invited the trial court to give CALCRIM No. 3471 so defendant may not claim on appeal that the court erred in giving this instruction.

10

### C. Ineffective Assistance of Counsel and Prejudice

Defendant contends that, if his trial counsel invited the court's error in giving CALCRIM No. 3471, his trial counsel was prejudicially deficient. In order to succeed on an ineffective assistance of counsel claim, a defendant must show that counsel's performance was deficient and that his defense was prejudiced by those deficiencies. (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 218; *Strickland* v. *Washington* (1984) 466 U.S. 668, 687.) "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694.)

Even if defendant's trial counsel had not invited the trial court to give CALCRIM No. 3471, any error in giving the instruction is, as defendant acknowledges, reviewed under *People v. Watson* (1956) 46 Cal.2d 818. (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1054-1055 (*Ross*).) "Under that standard, an error warrants reversal 'only if, "after an examination of the entire cause, including the evidence" (Cal. Const., art. VI, § 13), it appears "reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred. [Citations.] A ' "reasonable probability" ' for these purposes 'does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility.' " (*Ibid.*)

Defendant cannot establish prejudice under either *Strickland* or *Watson*. CALCRIM No. 3471 was solely concerned with the validity of defendant's self-defense claim, but his self-defense claim itself was utterly without the slightest merit. He conceded that he strangled Doe but claimed that he was justified in doing so as a response to her holding onto or pulling on his jacket and throwing her wedding ring toward him. To credit defendant's self-defense claim, a juror would have had to find that there was a reasonable doubt as to whether "defendant used no more force than was reasonably necessary to defend against" Doe's actions. There is no reasonable chance that a rational

11

juror could possibly have entertained the slightest doubt that defendant's strangulation of Doe exceeded the force reasonably necessary to defend against Doe pulling on defendant's jacket and tossing her wedding ring toward him. Under these circumstances, any error in giving CALCRIM No. 3471 and any deficiency in defendant's trial counsel's request for this instruction were harmless.

## IV. Disposition

The judgment is affirmed.

_____

Mihara, J.

WE CONCUR:



_____

Bamattre-Manoukian, Acting P. J.




_____

Márquez, J.

13