Filed 5/9/16  P. v. Fuller CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ROBERT ELI FULLER,<br><br>    Defendant and Appellant. | H041280<br>(Santa Clara County<br>Super. Ct. No. C1361912) |

Defendant Robert Eli Fuller punched José Muñoz Robles in a "road rage" incident.  A jury found defendant guilty of battery causing serious injury and assault by means likely to produce great bodily injury.  As to both counts, the jury found defendant personally inflicted great bodily injury upon the victim.  Defendant admitted having four prior "strike" convictions.  The trial court imposed a total term of 21 years in state prison.

On appeal, defendant contends the trial court erred by instructing the jury on the limited availability of the right to self-defense when a defendant engages in mutual combat.  We conclude the trial court properly instructed the jury based on the evidence adduced at trial.  Accordingly, we will affirm the judgment.

# I. FACTUAL AND PROCEDURAL BACKGROUND

## A. Facts of the Offense

### 1. Testimony of José Muñoz Robles

José Muñoz Robles, the victim, testified as follows. As a traffic enforcement officer, Robles was accustomed to dealing with disgruntled and aggressive motorists. In doing so, he always tried to defuse tense encounters by remaining calm, maintaining a friendly demeanor, and using an appropriate tone of voice.

On June 22, 2013, Robles was driving his 1994 Honda Prelude with his girlfriend, Nicole Isaac, in the passenger's seat. At approximately 4:47 p.m., they were waiting at a traffic light at the intersection of Brokaw Road and Coleman Avenue in the city of Santa Clara. Robles was in the right lane of Brokaw Road, waiting to turn right onto southbound Coleman Avenue. The light was red, and the traffic on Coleman Avenue was too heavy to make a right turn safely.

While waiting to turn, Robles heard a loud, persistent honking from a silver SUV behind him. The driver of the SUV was making erratic hand motions. Robles inferred the driver wanted him to move forward, but Robles remained stationary because it was still unsafe to turn. Robles testified that at that point, "the driver made a maneuver which made me maneuver." The silver SUV swerved into the left turn lane, which made Robles think the driver was attempting to go around him. So Robles "maneuvered a little to the left" to indicate that he (Robles) would move. The silver SUV then pulled up beside Robles on the left and stopped.

Defendant got out of the driver's side of the silver SUV. He walked around the front of the SUV and approached Robles' car. Defendant was walking in a determined manner, as if to say, "I'm going to do something." He was gesturing with his hands, pushing them towards himself as if to say, "Here, here." Robles did not want to put his girlfriend or his property in danger, so he stepped out of his vehicle in an attempt to defuse the situation. Using "a military tactic" designed to scare defendant away, Robles

2

said, "What are you going to do," and placed his left fist into his right hand with a smacking sound. Defendant kept coming towards him. Robles took one or two steps forward and said something like: "Okay. Do you want to play?"

At that point, defendant struck Robles. Robles, who was knocked unconscious, could not recall how many times defendant hit him. He could not remember seeing defendant's hands coming toward him. He found himself lying on the ground, trying to wake up. His girlfriend was pulling him out from under the front left side of the car and trying to pick him up. Defendant was gone. Robles never fought back against defendant, and never swung his fists towards him. Robles did not have anything in his hands, and he did not have a weapon.

Robles was diagnosed with a concussion, and he was unable to close his jaw for some time. He had a cut on his lower lip, and his arm was bleeding.

2. *Testimony of Ann Blair*

Ann Blair was in a car on Brokaw Road behind the silver SUV at the time of the incident. The light at the intersection was red, and she was waiting behind the other cars to make a right turn onto Coleman Avenue. The cross traffic on Coleman Avenue was "pretty heavy" at the time.

Blair then heard honking from the SUV in front of her. The cross traffic on Coleman Avenue had stopped, and the cars in her lane were free to make the right turn. The cars in the left turn lane were moving forward to turn left. However, the car in front of the SUV was "kind of stopped or going slowly." At that point, the SUV turned into the left lane to go around the car, but the car immediately turned a few feet to the left, cutting off the SUV. Both vehicles stopped, and Blair thought, "This doesn't look good." The two cars were parked in a V-shaped, wedge formation, with the SUV's right headlight next to the car's left front tire.

Blair then saw defendant get out of the SUV and walk around to the front of the vehicle. Defendant appeared very angry, with a set jaw, and a stern, forceful demeanor.

3

Robles appeared surprised and stepped part way out of his car. Robles was gesturing with his hands while standing in between the open door and the frame of the car. At that point, Blair looked down to find her phone in an attempt to take a photograph. When she looked back up, Robles had closed his car door and had walked forward. Looking through the windshield of the SUV, Blair saw the defendant drawing his arm back with his hand balled into a fist. She could not see Robles' head. She saw defendant's fist "go back again, and then it went forward." At that point, she could not see Robles' body; he was on the ground with the soles of his shoes facing upwards. Blair then realized Robles had been struck.

Blair wrote down the SUV's license plate number on a piece of paper while the SUV fled from the scene. Robles was lying on the ground "out cold" with a bloody face. Blair called 911.

### 3. *Testimony of Other Witnesses*

*Mary Issac*—Mary Isaac, Robles' girlfriend, was sitting in the passenger seat of Robles's Honda during the incident. Robles was waiting for the red light when they heard honking from a silver SUV behind them. After a few moments, the SUV pulled up to the left side of the Honda. Robles pulled to the left, and the SUV stopped. The driver of the SUV then took off his seatbelt and rushed out of his car. Robles got out while the driver of the SUV approached him. The driver of the SUV was mad and aggravated, raising his fist as he approached Robles. Isaac then saw Robles falling onto the hood of the Honda. She did not see the driver of the SUV making contact with Robles because the frame of the car blocked her view.

*Santa Rangel*—Santa Rangel was in her car at the intersection waiting to turn left onto Coleman Avenue. She saw two vehicles that appeared to be involved in a collision. The driver of a silver SUV quickly got out of his vehicle and started yelling at the person in the other car. The driver of the car got out and started yelling back. The driver of the SUV then punched the driver of the car twice in the face. The driver of the car fell to the

4

ground and lay there as if he was unconscious. The driver of the SUV got back in his vehicle and fled.

*Richard Torres*—Richard Torres and his girlfriend were in a car on Coleman Avenue waiting at a red light at the intersection with Brokaw Road. The vehicles on Brokaw Road had a green light, but "there was a commotion going on." Torres saw defendant stepping out of a silver SUV in an erratic fashion. Robles was getting out of his car with this hands up as if to say, "my bad." Defendant punched Robles once in the jaw, whereupon defendant fell onto the pavement. Defendant got back into his SUV and sped off. Torres got a good look at the SUV's license plate and wrote it down on a piece of paper to give to the police.

*Officer Luke Erickson*—Santa Clara Police Officer Luke Erickson arrived at the intersection shortly after 4:38 p.m. Robles had a swollen, bleeding lower lip, and he appeared to be confused or in shock. Officer Erickson requested medical personnel, and Robles was transported to the hospital. Ann Blair, a witness, gave Officer Erickson a piece of paper with the license plate number of the SUV. Police determined the vehicle belonged to defendant. They found him and his vehicle at his residence several hours later. Defendant had a small laceration on the knuckles of his left hand consistent with striking someone or something. Police took defendant into custody.

B. *Procedural Background*

In September 2013, the prosecution charged defendant by information with two counts: Count One—Battery causing serious bodily injury (Pen. Code, §§ 242, 243, subd. (d))[1]; and Count Two—Assault by means of force likely to produce great bodily injury (§245, subd. (a)(4)). As to both counts, the information alleged defendant personally inflicted great bodily injury upon the victim. (§12022.7, subd. (a).) The

---

[1] Subsequent undesignated statutory references are to the Penal Code.

information further alleged defendant had suffered four prior serious or violent felony convictions. (§§ 667, subds. (a), (b)-(i), 1170.12.)

The case proceeded to trial in December 2013. In pretrial proceedings, defendant admitted the prior strike allegations. The jury found defendant guilty on both counts and found the enhancements to be true as to both counts.

At sentencing, the trial court granted defendant's *Romero*[2] motion and struck three of defendant's four prior strikes. The court imposed a total sentence of 21 years in prison, equal to eight years (double the upper term) for Count Two plus three years for the serious bodily injury enhancement, both consecutive to 10 years for the strike prior. The court stayed all punishments as to Count One.

## II. DISCUSSION

At trial, defendant put forth a theory of self-defense. On appeal, he contends the trial court erred by instructing the jury on mutual combat, thereby precluding the jury from properly considering his claim of self-defense. The Attorney General argues the instruction was proper, but that even if the instruction was erroneous, any error was harmless. We conclude the trial court properly instructed the jury on mutual combat.

A. *Procedural Background*

The trial court instructed the jury on the right to self-defense based on CALCRIM No. 3470. The court also proposed to instruct the jury on mutual combat based on CALCRIM No. 3471. Defendant objected to this latter instruction on the ground that the evidence did not show the parties engaged in combat by mutual consent or agreement. Defendant argued there was no evidence the parties had a simultaneous intent to fight.

Over defendant's objection, the court found the evidence supported the instruction. The court therefore instructed the jury as follows: "A person who engages in mutual combat or who starts a fight has a right to self-defense only if, one, he actually and in

_____

[2] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

6

good faith tried to stop fighting; and, two, he indicated by word or by conduct to his opponent in a way that a reasonable person would understand that he wanted to stop fighting and that he had stopped fighting; and three, he gave his opponent a chance to stop fighting. [¶] If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight. [¶] A fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose."

The court also instructed the jury that "[s]ome of [] these instructions may not apply depending on your findings about the facts of the case. Do not assume because I am giving a particular instruction, that I'm suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them."

B. *Legal Principles*

Even in the absence of a request, a trial court must instruct the jury on the general principles of law relevant to the issues raised by the evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) "The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." (*People v. St. Martin* (1970) 1 Cal.3d 524, 531.)

"It has long been established that one who voluntarily engages in mutual combat with another must have endeavored to withdraw therefrom before he can be justified in killing his adversary to save his own life." (*People v. Fowler* (1918) 178 Cal. 657, 671, disapproved on another point by *People v. Thomas* (1945) 25 Cal.2d 880.) "[T]he phrase 'mutual combat' has been in general use to designate the branch of the law of self-defense relating to homicides committed in the course of a duel or other fight begun or continued by mutual consent or agreement, express or implied." (*People v. Fowler*, at p. 671.) "The mutuality triggering the doctrine inheres not in the combat but in the

7

*preexisting intent to engage in it.* Old but intact caselaw confirms that as used in this state's law of self-defense, 'mutual combat' means not merely a reciprocal exchange of blows but one *pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities.*" (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1045 (*Ross*), italics in original.) "[I]t is not merely the *combat*, but the *preexisting intention to engage in it*, that must be mutual." (*Ibid.*, fn. omitted, italics in original.)

C. *The Trial Court Properly Instructed the Jury*

Defendant contends the trial court erred by instructing the jury on mutual combat because there was no evidence that the parties had any prearranged agreement to fight. The Attorney General concedes the parties had no express agreement to fight, but she responds that the jury could have inferred an implicit agreement based on the parties' conduct. We agree with the Attorney General.

After the two men stopped their vehicles, defendant exited his vehicle in an aggressive manner. He appeared angry and aggravated. Witnesses testified that defendant was yelling at Robles or gesturing with his hands so as to invite a physical encounter. Robles, by his own admission, got out of his car, punched his left fist into the palm of his right hand, and responded, "Do you want to play?" The jury reasonably could have inferred from this conduct that the parties simultaneously and implicitly agreed to fight each other. The evidence thereby supported the trial court's instruction.

Furthermore, the court instructed the jury that the doctrine applies in the disjunctive to "[a] person who engages in mutual combat *or* who starts a fight . . . ." The prosecution presented evidence that defendant initiated the fight. Defendant concedes that substantial evidence supported the latter part of this rule, applying the doctrine to the initial aggressor. Furthermore, the trial court instructed the jury that "these instructions may not apply depending on your findings about the facts of the case . . . ."

In the absence of any indication to the contrary, we assume the jury properly followed these instructions. Accordingly, if the jury did not find sufficient evidence of

mutual combat, it would not have applied the challenged instruction to defendant's detriment unless it also concluded he was the initial aggressor.

Defendant's reliance on *Ross* is misplaced. There, the trial court instructed the jury on mutual combat based on CALJIC No. 5.56. (*Ross*, *supra*, 155 Cal.App.4th at p. 1042, fn. 9.) At the time, the instruction contained no definition of the phrase "mutual combat." In deliberations, the jury asked the trial court to provide a legal definition of that phrase. The court declined to provide any definition and instructed the jury to rely on the "common, everyday meaning of those words or that phrase." (*Id.* at p. 1043.) This court held the trial court erred because the legal meaning of mutual combat requires a preexisting intent by the parties to engage in it. We found it likely that the jury convicted defendant based on a mistaken understanding of mutual combat and, accordingly, we reversed the conviction. Here, by contrast, the trial court properly instructed the jury that "[a] fight is mutual combat when it began or continued by mutual consent or agreement," which consent or agreement "must occur before the claim to self-defense arose." Under the holding of *Ross*, this is a proper statement of the doctrine. Thus, there is no reasonable probability the jury misapplied the instruction. We therefore conclude defendant's appeal is without merit.

### III.   DISPOSITION

The judgment is affirmed.

_____
Márquez, J.

WE CONCUR:

_____
Rushing, P.J.

_____
Premo, J.

10