Filed 10/13/22  P. v. Boewer CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>TRICIA BOEWER,<br><br>    Defendant and Appellant. | H048782<br>(Monterey County<br>Super. Ct. No. 18CR011665) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>NOAH ISAAC BOEWER,<br><br>    Defendant and Appellant. | H048792<br>(Monterey County<br>Super. Ct. No. 18CR011664) |

**I.  INTRODUCTION**

In a joint trial, defendant Tricia Boewer was convicted by jury of misdemeanor battery on the victim (Pen. Code, § 242),[1] and defendant Noah Isaac Boewer[2] was convicted of assault by means of force likely to produce great bodily injury on the same

---

[1] All further statutory references are to the Penal Code.

[2] For clarity and convenience, we hereafter refer to defendants by their first names.

victim (§ 245, subd. (a)(4)). The jury also found true the allegation that Noah personally inflicted great bodily injury on the victim (§ 12022.7, subd. (a)). The trial court granted Tricia a one-year conditional sentence with various terms and conditions. Noah was sentenced to six years in prison.

On appeal, both defendants contend that the trial court erred by instructing the jury on mutual combat because there was no evidence to support the instruction. They argue that the error violated their federal constitutional rights and that the error was prejudicial. To the extent the claim has been forfeited, defendants contend that their trial counsel rendered ineffective assistance of counsel.

For reasons that we will explain, we will affirm the judgment as to each defendant.

## II. BACKGROUND

### A. *The Trial*

Defendants were charged by a single amended information containing separate case numbers for each defendant. Relevant to their appeals,[3] the evidence presented at their joint trial included the following:

### 1. The Prosecution's Case

An altercation occurred between defendants and the victim outside a bowling alley on July 6, 2018. The victim, who is Black, was almost 60 years old, six foot three inches, and about 200 pounds at the time of the incident.

The victim testified that he left the bar in the bowling alley and went outside. When he exited, defendants, who witnesses described as a White female and a White male, were standing outside with their backs to the door. The victim testified that he said, "Excuse me," and walked around defendants. According to the victim, he only got as close as four to six feet to the pair, and he did not touch either of them. He testified

---

[3] This court denied the Attorney General's motion to consolidate the appeals but this court on its own motion ordered that the two appeals be considered together for oral argument and disposition.

2

that he said "excuse me" as "sort of a warning" to avoid them possibly turning around and walking into him.

The victim testified that as he continued to walk, defendant Tricia said, "Yeah, you better, nigger." The victim "[g]lance[d] back" because he could not believe what he had just heard. Tricia proceeded to say "a paragraph of things" such as "What are you looking at? Don't look at me, nigger," "What you looking at, motherfucker?" and "You better keep walking."

Defendant Noah joined in, asking, "Are you looking at my old lady? What the fuck are you looking at?" He also stated to the victim, "Today is not the day," and asked "What are you looking at? Do you want to go a couple of rounds?" The victim understood Noah to mean that "he wanted to fight." Noah was in a "boxing position," "swaying back and forth" with his "[h]ands up."

When defendant Noah had asked the victim if he was looking at defendant Tricia, the victim "told him no, she wasn't worth looking at." The victim testified that when Noah asked about going "a couple of rounds," the victim wondered why anyone would say that. The victim walked back towards Noah and asked, "What is going on? What's wrong with you[?]"

The victim and defendant Noah "continued to go back and forth a little bit verbally" when, according to the victim, Noah attempted to "throw a punch." The victim blocked it and "countered" with his own punch. The victim testified that he was "defending himself" and that he "wasn't trying to do serious damage." Noah kept trying to punch the victim, and the victim punched Noah two or three times.

Eventually the pair stopped and put their hands down. The victim thought it was "over," but defendant Noah then attempted to kick the victim in the groin. Noah missed and ended up kicking the victim in his upper thigh. The victim testified that defendant Tricia immediately jumped on his (the victim's) back, putting her arms around his upper

3

torso, and her legs on his waist. The victim testified that he "grabbed her arm" and "threw her" off.

The victim testified that he "looked up to see where [defendant Noah] was and basically met his fist." The punch by Noah was "with a lot of force" and landed on the left side of the victim's face. The victim felt "ringing and sharp pain." Noah appeared "pretty elated." The victim "tackled [Noah] to the ground" and held him down. Noah, who was on his back, tried to wrap his legs around the victim and attempted to punch the victim. One punch hit the victim on the left side of the face again. In response, the victim attempted to hit Noah to slow or stop him.

The victim testified that during the fight, defendant Noah called him names, and that after the punching, Noah called him a "nigger" one time.

Eventually the pair were separated by the assistant manager of the bowling alley. The police also arrived. The victim told the police that the first thing he heard from defendants were words to the effect of, "Keep walking, motherfucker," or "Yeah, motherfucker. Turn around and walk away." As a result of the altercation, the victim suffered multiple facial bone fractures, including to the eye socket, cheekbone, and jaw.

The bartender testified that while she was inside, she saw defendant Noah outside "swinging on" the victim with a closed fist. The victim was trying to stop Noah with a "bear hug." The bartender did not see the victim punch Noah at any point. The bartender ran to get the assistant manager. The bartender testified that when she and the assistant manager went outside, defendant Noah and the victim had fallen to the ground. Defendant Tricia jumped on top of the victim and was punching him and telling him to get off Noah. The bartender testified that after the parties were separated, both defendants referred to the victim as a "nigger" more than once.

The bartender also testified that earlier before the altercation, defendants had been drinking in the bar for a short period of time. Defendant Noah accused two men, who were described as "Indian" by the bartender, of staring at defendant Tricia. Noah

4

threatened the men that he would "knock [their] fucking teeth out" if they kept looking over. The bartender testified that Noah also said, "Fucking Indians," or something similar. The two men denied looking at defendants and left the bar.

The assistant manager testified that when he went outside the bowling alley, he saw the victim holding down defendant Noah on the ground. The assistant manager did not see any punching. He separated the victim and Noah. The assistant manager heard defendant Tricia repeatedly call the victim a "nigger" and told her to stop twice.

Two customers, a man and his girlfriend who were playing pool in the bar, saw part of the altercation between defendants and the victim. The man testified that the victim was on top and trying to keep defendant Noah from hitting him (the victim). Defendant Tricia was hitting the victim on the back of the head. The man heard both defendants call the victim a "nigger" multiple times. The man also heard Noah tell the victim not to look at Tricia "like that." The man did not see the victim punch either defendant. The man's girlfriend testified that Tricia called defendant a "nigger."

### 2. Defendant Tricia's Case

Defendant Tricia testified on her own behalf. She is five feet three inches tall, and at the time of the incident she weighed about 125 or 130 pounds. Defendant Noah was her husband although they were not "together" at the time of the trial.

Defendant Tricia testified that prior to the altercation with the victim, when she was at the bar with defendant Noah, she heard one of the Indian men say, "I'd hit that," which she interpreted to be a sexual comment. Tricia testified that Noah called the men, "Fucking idiots," and that he did not say "Fucking Indians."

Defendant Tricia testified that when she and defendant Noah were standing outside the bowling alley to smoke, she felt a "soft touch" run across her buttocks. Tricia believed the touch was by the victim, who had walked by, rather than by Noah, who was about eight feet away at the time. Tricia testified that the victim stopped when he was

5

about 40 feet away, turned around, tilted his head to the side, stuck out his tongue, and nodded up and down as he looked at her "from head to toe and back up again."

Defendant Tricia testified that she said to the victim, "What the fuck is wrong with you? Keep walking, motherfucker." She told defendant Noah that the victim had touched her buttocks. Noah asked the victim, "What's wrong with you? Why are you looking at my lady?"

Defendant Tricia testified that the victim "threw up his arms and said, 'You want a piece?' " According to Tricia, "Noah said, 'I do.' " The victim walked "very quickly" towards them with one "fist up next to his face cocked back and one in front of his chin." Tricia testified that Noah "took a step back and put his fists up in front of his face."

Defendant Tricia testified that the victim attempted to punch defendant Noah in the face, but Noah was blocking his own face with his fists. According to Tricia, "[a]t that point they were both throwing fists and hands were flailing all over the place and arms flailing and [the victim] was coming forward still and Noah was backing up. . . . [I]t was chaos. It just happened so fast."

Defendant Tricia testified that when defendant Noah stepped behind a pole, she went between the pair of men, put her hands up, and told them to stop. According to Tricia, Noah put his hands down and stepped back. However, the victim "reached behind [Tricia's] back, grabbed [her] left arm, twisted [her] and threw [her] about 5 feet away off the ground." When she landed, she was in a "great deal of pain." Tricia acknowledged calling the victim a "stupid fucking nigger." She testified that she "wanted to say the worst possible thing that [she] could think of . . . and hurt him the way he hurt [her]." She denied using the racial slur at any other time during the incident, and she testified that she regretted saying it.

Defendant Tricia testified that when she fell to the ground, defendant Noah hit the victim for the "first time that [she] saw." When Noah attempted to help Tricia off the ground, the victim punched him, threw him in the dirt, and got on top of him. Noah

6

screamed for help, so Tricia ran into the bar to ask for help but no one moved. Tricia ran back outside and called 911 on her phone. She testified that while she was on the phone, other people finally appeared at the scene and eventually the police arrived. Tricia denied jumping on the victim's back or punching him in the head.

### 3. Defendant Noah's Case

Defendant Noah testified on his own behalf. At the time of the incident, he was 47 years old, five feet nine inches tall, and about 160 to 165 pounds.

Defendant Noah testified that when he was at the bar with defendant Tricia, he saw a man lean to another man, point at Tricia's "rear end," and say "that he would hit that." Noah testified that he was "really upset" by the comment. He testified that he called the men "Fucking idiots" and denied using the term "Indians."

Regarding the incident with the victim, defendant Noah testified that he was protecting himself and his wife after she had been "grabb[ed]" and "assault[ed]." He testified that when he and defendant Tricia were outside the bowling alley, the victim walked by within a couple of feet behind Tricia. It appeared to Noah that the victim's hand "grazed [Tricia's] butt as he walked by." Noah believed it was intentional because it looked like the victim was "reaching for something." Tricia appeared stunned. She told Noah that the victim had "touched her butt." When the victim was about 30 to 40 feet away, he turned around, "look[ed] her up and down," and had his tongue out. Tricia, who was upset, told the victim, "Keep walking, motherfucker."

Defendant Noah testified that he stated to the victim, "What the hell. Have some respect. Why are you looking at my wife that way?" The victim responded, "She's not worth it." When asked at trial what happened next, Noah testified, "It looked like he was sizing me up, looking me up and down, and he asked me if I wanted a piece." Noah was "extremely upset" and "thought it was extremely rude." Noah responded, "Yeah, I do."

Defendant Noah testified that after "those words were exchanged between us," the victim quickly approached him. When the victim was within 10 feet of Noah, the victim

7

positioned his hands so that it looked like he was going to "throw a punch." Noah was only able to partially block the punch, which hit him in the face. Noah unsuccessfully attempted to punch the victim, and the victim responded with another punch. Noah testified that he moved backwards to try to put distance between them, but the victim had a "long stride" and was able to "throw[] punches . . . faster than [Noah] could deal with." Although Noah tried to "block" the punches, the victim was able to land about five or six punches on Noah's face.

Defendant Noah testified that when there was a pole between them, defendant Tricia got in between the men and put her hands up and indicated that they should stop. Noah took a step back and put his hands by his sides. The victim called Tricia a "fucking bitch," grabbed her arm, and threw her.

Defendant Noah testified that he "tried to stop" the victim by throwing punches at him as hard as he could. The victim stumbled back a few feet. When Noah went to help defendant Tricia off the ground, the victim punched Noah in the face. Noah landed on the ground on his back, and the victim stick his thumb into Noah's right eye. While kneeling over Noah, the victim also grabbed Noah's shirt and punched him in the face "intermittently" while also picking him up and slamming him back down. Noah testified that he tried to grab the victim's wrists to stop the punches, tried to hit him, and tried to get him off. Eventually the victim stopped and moved away from Noah.

Defendant Noah testified that defendant Tricia never jumped on the victim's back. Noah denied calling the victim a "nigger" and stated that Tricia used the word when she was "thrown to the ground."

Defendant Noah testified that he suffered injuries from the altercation, including a black eye and conjunctivitis in one eye.

The police officer who interviewed the parties immediately after the incident testified that the victim never reported that he was called a "nigger." The officer also did not hear defendant Tricia use the word while the officer was on scene. Defendant Noah

8

initially reported to the officer that the victim had touched defendant Tricia's arm. Noah later reported that the victim had touched her "butt."

### 4.  The Prosecution's Rebuttal Case

During the 911 call, defendant Tricia reported that a "guy grabbed" her, her "husband defended [her]," and that the men "got in a fight." When asked why the man grabbed her, Tricia responded that the man was looking at her "rudely," that she told him to stop, he called her a "bitch," and then her husband approached him. She further reported that after the man called her a "bitch," her husband told the man to apologize. The man grabbed her arm and "threw" her to the side. When her husband stood in front of the man, the man tried to punch Noah in the face.

### B.  *The Jury Verdicts and Sentencing*

The jury found defendant Tricia guilty of misdemeanor battery (§ 242; count 3) but found not true the allegation that the offense was committed for the purpose of interfering with the victim's civil rights (§ 422.7). The jury found Tricia not guilty of assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4); count 1) and not guilty of misdemeanor interference with the victim's civil rights (§ 422.6; count 2).

The jury found defendant Noah guilty of assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4); count 1) and found true the allegation that he personally inflicted great bodily injury (§ 12022.7, subd. (a)). The jury found him not guilty of misdemeanor interference with the victim's civil rights (§ 422.6; count 2).

The trial court suspended imposition of defendant Tricia's sentence and placed her on a one-year conditional sentence with various terms and conditions, including that she serve 60 days in county jail. Defendant Noah was sentenced to six years in prison.

### III.  DISCUSSION

Both defendants contend that the trial court erred by instructing the jury with CALCRIM No. 3471 regarding mutual combat because there was no evidence to support

9

the instruction. They argue that the instruction "severely weakened the only defense to the alleged assault" – self-defense or defense of another – by giving "the jury the false impression that self-defense or defense of another" was "limited" if there was an "exchange[ of] blows." Defendants contend that the error violated their federal constitutional rights to a jury trial, to adequate instructions on their theory of defense, and to a complete defense, and that the error was prejudicial. They further argue that this court may consider their claim of error even though they failed to object to the instruction below. To the extent the claim has been forfeited, defendants contend that their respective trial counsel rendered ineffective assistance of counsel.

**A.** *The Proceedings Below*

The trial court instructed the jury regarding the right to self-defense in the context of mutual combat as follows:

"A person who engages in mutual combat or who starts a fight has a right to self-defense only if:

"1.     He or she actually and in good faith tries to stop fighting;

"2.     He or she indicates, by word or by conduct, to the opponent, in a way that a reasonable person would understand, that he or she wants to stop fighting and that he or she has stopped fighting;

"AND

"3. He or she gives the opponent a chance to stop fighting.

"If a person meets these requirements, he or she then had a right to self-defense if the opponent continued to fight.

"A fight is *mutual combat* when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose." (See CALCRIM No. 3471.)

10

**B.** *General Legal Principles Regarding Mutual Combat*

" '[A]s used in this state's law of self-defense, "mutual combat" means not merely a reciprocal exchange of blows but one *pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities. . . .* In other words, it is not merely the combat, but the *preexisting intention to engage in it*, that must be mutual.' [Citation.]" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1044 (*Nguyen*).) "[F]ighting by mutual intention or consent" is "most clearly reflected in an express or implied agreement to fight." (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1046-1047, italics omitted (*Ross*).) If mutual combat occurs, a "defendant's participation in the mutual combat 'may preclude reliance on self-defense to defeat a charge of assault, or similar offense, unless [the defendant] took specific steps to desist from the combat.' [Citations.]" (*People v. Jackson* (2014) 58 Cal.4th 724, 760-761.)

**C.** *General Legal Principles Regarding Jury Instructions*

"A trial court must instruct the jury on every theory that is supported by substantial evidence, that is, evidence that would allow a reasonable jury to make a determination in accordance with the theory presented under the proper standard of proof. [Citation.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1206.) Stated another way, "[s]ubstantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive. [Citation.]" (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8 (*Barton*).) At the same time, " 'unsupported theories should not be presented to the jury.' [Citation.]" (*People v. Marshall* (1997) 15 Cal.4th 1, 40.) Indeed "[i]t is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case. [Citation.]" (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.)

In this case, defendants acknowledge that they failed to object below to the instruction regarding mutual combat. An "appellate court may . . . review any instruction given . . . even though no objection was made thereto in the lower court, if the substantial

11

rights of the defendant were affected thereby." (§ 1259.) We will assume, without deciding, that section 1259 preserves defendants' claim of instructional error. We therefore need not reach defendans' claim of ineffective assistance of counsel.

### D. *Analysis*

Defendants contend that, prior to the fight with the victim, there was no substantial evidence "of a mutually preexisting intention to engage in combat." According to defendants, the trial court therefore erred in instructing the jury with CALCRIM No. 3471 regarding mutual combat.

We determine that there was substantial evidence of mutual combat—that is, "evidence sufficient to 'deserve consideration by the jury' " and "that a reasonable jury could find persuasive"—to warrant an instruction on the issue. (*Barton*, *supra*, 12 Cal.4th at p. 201, fn. 8.) Specifically, there was substantial evidence that defendant Noah and the victim had a "mutual intent[], consent, or agreement" to engage in a physical fight before they actually exchanged blows. (*Nguyen*, *supra*, 61 Cal.4th at p. 1044, italics omitted.)

In this regard, defendant Tricia testified that just prior to the fight, the victim "threw up his arms" and asked, "*You want a piece*?" (Italics added.) Tricia testified that Noah responded, "*I do*." (Italics added.) After this verbal exchange, the victim approached with one "fist up next to his face cocked back and one in front of his chin." Noah likewise "put his fists up in front of his face."

Defendant Noah similarly testified "It looked like [the victim] was sizing me up, looking me up and down, and *he asked me if I wanted a piece*." (Italics added.) Noah testified that he responded to the victim, "*Yeah, I do*." (Italics added.) Noah acknowledged that after "those words were exchanged between" them, the victim approached and positioned his hands so that it looked like he was going to "throw a punch." Noah partially blocked the punch, which hit him in the face. Noah attempted to punch the victim, and the victim responded with another punch.

Along these lines, the victim testified that Noah asked him, "*Do you want to go a couple of rounds*?" which the victim understood to mean that Noah "wanted to fight." (Italics added.) Noah was in a "boxing position," "swaying back and forth" with his "[h]ands up." The victim acknowledged that he and Noah "continued to go back and forth a little bit verbally" before the punching began.

Although the victim did not testify that he verbally agreed to fight, the testimony of either defendant alone, or defendants' testimony in combination, provided substantial evidence that defendant Noah and the victim had "an express or implied agreement to fight" before the actual exchange of blows and "before the claimed occasion for self-defense arose." (*Ross*, *supra*, 155 Cal.App.4th at pp. 1046-1047, italics omitted.) A reasonable jury could find that defendants' testimony about the victim asking Noah whether he "*wanted a piece*," and Noah's affirmative response of "*I do*," constituted a mutual intent, consent, or agreement to fight. (Italics added.) This conclusion is further buttressed by the testimony of each defendant and the victim that after the exchange of words regarding whether the other man wanted "a piece" or "to go a couple of rounds," one or both men put up their fists. On this record, we find no error in the trial court instructing the jury regarding mutual combat.

We are not persuaded by defendant's reliance on *Ross*, *supra*, 155 Cal.App.4th 1033. In that case, "the parties exchanged contemptuous remarks until [the victim] lost her temper and slapped defendant, whereupon he punched her back." (*Id.* at p. 1054.) To the extent the victim had verbally referred to fighting before slapping the defendant, the victim's references were to her boyfriend or someone else beating up defendant. (*Id.* at pp. 1037-1038.) As this court explained, the victim did not "manifest an intention to fight by her words or conduct. Her own account had her steadfastly refusing defendant's invitations to fight, telling him instead to wait for her boyfriend, who would 'talk to him about that,' i.e., defendant's supposed 'wanting to go out back and kick your ass . . . .' " (*Id.* at p. 1053.)

13

In contrast, in this case, there was testimony by each defendant that the victim expressly asked whether defendant Noah wanted "a piece," that Noah expressly responded affirmatively with, "I do," and that one or both men raised their fists in preparation to fight thereafter. On this record, there is substantial evidence upon which the jury could have found mutual combat and the trial court did not err in instructing the jury accordingly.

In sum, we determine that each defendant fails to establish a basis for reversing the judgment.

## IV. DISPOSITION

The judgment is affirmed in H048782 and in H048792.

_____

BAMATTRE-MANOUKIAN, ACTING P.J.


WE CONCUR:




_____

DANNER, J.




_____

WILSON, J.




*People v. Tricia Boewer*
**H048782**
*People v. Noah Isaac Boewer*
**H048792**